<u>NOT YET SCHEDULED FOR ORAL ARGUMENT</u>

## BRIEF FOR APPELLANT

===================================================================

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

=========================

## D.C. CIR. NO. 16-5067

=========================

### ANGELA CLEMENTE

**Appellant,**

v.

## FEDERAL BUREAU OF INVESTIGATION, <u>ET AL.</u>

**Appellees**

=========================

James H. Lesar
D.C. Bar No. 114413
930 Wayne Ave., Unit 1111
Silver Spring, MD 20910
Phone: (301) 328-5920

Dated: Aug. 15, 2016

**Counsel for Appellant**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ANGELA CLEMENTE, | : | |
| | : | |
| Appellant, | : | |
| | : | |
| v. | : | D. C. Cir. No. 16-5067 |
| | : | C. A. No. 08-1252 (BJR) |
| | : | |
| FEDERAL BUREAU OF | : | |
| INVESTIGATAION, ET AL., | : | |
| | : | |
| Appellees | : | |

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

ANGELA CLEMENTE, appellant in the above-captioned case,

hereby submit this certificate of counsel as to parties, rulings, and related

cases pursuant to Rule 28 and this Court's order of April 7, 2016.

1. Parties and Amici

No amici appeared in this case below. The parties appearing below

are ANGELA CLEMENTE, plaintiff, and the FEDERAL BUREAU OF

INVESTIGATAION and the DEPARTMENT OF JUSTICE, defendants.

2. Rulings under Review.

The rulings under review are:

Doc. 140, Jan. 29, 2016 Order Dismissing Civil Action No. 08-1252;

Doc. 139, Dec. 1, 2015 Order Denying Plaintiff's Motion for Reconsideration;

Doc. 131, Oct. 14, 2015, Order Denying Plaintiff's Renewed Motion for an Interim Award of Attorney Fees and Costs;

Doc. 121, Aug. 18, 2014, Order Granting in Part and Denying in Part Defendants' Second Renewed Motion for Summary Judgment

Doc. 98, Aug. 30, 2013, Order Denying Plaintiff's Motion for an Interim Award of Attorney's Fees and Costs;

Doc. 81, April 13, 2012, Order granting Renewed Motions for Summary Judgment in Part and Denying the remainder Without Prejudice;

Doc. 61, Aug. 3, 2011, Memorandum Opinion and Order;

Doc. 42, Sept. 28, 2010, Opinion;

Doc. 41, Sept. 28, 2010, Denying Defendant's Motion for Summary Judgment and Supplemental Motion for Summary Judgment are Denied with Prejudice as to Count II and Without Prejudice as to Counts I and III of Plaintiff's Second Amended Complaint, Etc.;

Doc. 16, Jan. 8, 2009. Memorandum Opinion and Order.

3. This case has not previously been before this Court.

/s/
James H. Lesar #114413
930 Wayne Avenue
Unit 1111
Silver Spring, MD 20910
Phone: (301) 328-5920

Counsel for Appellant

Dated: May 13, 2016

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Statement of Issues | | 1 |
| Statutes and Regulations | | 3 |
| Jurisdiction | | 4 |
| Statement of the Case | | 4 |
| A. | General Background | 4 |
| B. | Clemente's FOIA Request | 6 |
| C. | Proceedings in District Court | 9 |
| D. | Motion for Interim Award of Attorney's Fees and Costs | 19 |
| | 1. Administrative Request for Award of Interim Fees | 19 |
| | 2. Clemente's First Motion for an Award of Interim Fees | 20 |
| | 3. The District Court's Denials of Motions for Interim Awards | 22 |
| Summary of Argument | | 23 |
| A. | Scope of the Request; Adequacy of the Search | 24 |
| B. | The District Court Twice Denied Clemente's Applications For an Interim Award of Attorney Fees and Costs | 25 |
| C. | The FBI Failed to Show That the Records at Issue Exemption 7's "Threshold" Test and Were "Compiled For Law Enforcement Purposes" | 27 |
| Argument | | 29 |
| I. | The FBI Failed to Meet its Burden to Conduct an Adequate Search for Responsive Records | 29 |

Page

A. Summary Judgment Principles and the Law Governing    29
The Adequacy of Agency Searches

B. The District Court Misconstrued the Scope of the Search    30

1. The Scope of the Request Included "The entire    30
UNREDACTED FBI File on Scarpa"
2. Two Placeholder Cards Show That the FBI Failed to    32
Produce Two Entire Sections of the FBI Headquarters
Alleged Informant File on Scarpa Which Are Clearly
Within the Scope of Clemente's Request

C. Flaws in the FBI's Search    35
1. Limitation of Search to Computerized Digital Index    35
2. Failure to Search Files of Assistant Directors    36
3. Failure to Search ELSUR Indices    37
4. The FBI Failed to Search Cross-References    38
5. Scarpa and the Mississippi Civil Rights Workers    38
6. More New Evidence of Inadequate Searches    42
7. The FBI's Affidavits Attesting to the Adequacy of Its    42
Lack Of Credibility

II. The District Court Abused Its Discretion in Twice Denying    44
Clemente's Motions for an Award of Interim Attorney Fees

A. Standard Governing Interim Award of Attorney Fees    44

B. The FBI Failed to Contest Either Clemente's Eligibility    44
Or Entitlement to Fees; The Only Remaining Issues
Were (1) Recognition of the Right to Interim Fees And
(2) The Amount of Fees to Be Paid

C. The District Court Abused Its Discretion in Denying    45
Clemente's 1st Interim Attorney's Fees Motion

D. The District Court Abused Its Discretion by Denying    49
Clemente's Renewed Motion for an Interim Award of
Attorney's Fees and Costs

Page

III.    The FBI Has Failed to Meet Its Exemption 7 Threshold            52
        Burden

        A.    The Exemption 7 Threshold                                 52

              1. The Evidence Shows the Information in the Informant     53
                 File Was Compiled As Part of a Joint Criminal
                 Enterprise Between TE Mafia Informant Scarpa and the
                 FBI; It was not Compiled for Law Enforcement Purposes
              2. The Scarpa Informant File Did Not Focus Directly        55
                 On Specific Alleged Illegal Acts Which Could
                 Result in Civil or Criminal Sanctions
              3. The Scarpa Informant File Was Compiled in              59
                 Connection with Oversight of Scarpa and Supervisory
                 Special Agent DeVecchio

IV.     The District Court Dismissal of this Action Was Unwarranted     63

Conclusion                                                             64

## TABLE OF CASES

| | Page |
|---|---|
| Allen v. F.B.I., 716 F.Supp. 667 (D.D.C. 1989) | 26,45,46, 49 |
| Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) | 29 |
| Aspin v. Dep't of Defense, 491 F.2d 24 (D.C. Cir. 1973) | 52 |
| Banner, 928 F.2d at 1152 | 16 |
| Biberman v. FBI, 496 F. Supp. 263 (S.D.N.Y. 1980) | 47,48 |
| Brian Wrenn, et al. v. District of Columbia and Cathy Lanier | 4 |
| *Campbell v. United States Dept. of Justice, 164 F.3d 20 (D.C. Cir. 1998) | 34,36,38 |
| Clemente v. FBI, 741 F.Supp.2d 64 (D.D.C. 2010) ("Clemente I") | 6,13,15 33,36,39, 53 |
| Clemente v. F.B.I., 854 F.Supp.2d 49 (D.D.C. 2012)( "Clemente II") | 6,14,15 |
| Electronic Privacy Info. V. U.S. Dept. of Homeland, 811 F.Supp.2d 216 (D.D.C. 2011) | 44 |
| Estate of Debra Davis v. the United States of America, et al., 340 F.Supp.2d 79 (D.Mass. 2004) | 57 |
| Fischer v. U.S. Dep't of Justice, 596 F.Supp.2d 34 (D,D.C. 2009) | 14,34 |
| *Hall v. C.I.A., C. A. No. 04-0814 (D.D.C. July 15, 2015) | 48 |
| Harrison v. Fed. Bur. of Prisons, 681 F.Supp.2d 76 (D.D.C. 2010) | 39 |
| *Hemenway v. Hughes, 601 F. Supp. 1002 (D.D.C. 1985) | 31 |

|  | Page |
|---|---|
| Jefferson v. Department of Justice, 284 F.3d 171 (D.C. Cir.2002) | 53,59 |
| *Judicial Watch, Inc. v. Rossotti, 326 F.3d 1309 (D.C.Cir.2003) | 33 |
| Killen v. Hood et al., 2011 WL 1103150 at *2. | 41 |
| Knight v. Food and Drug Admin., 938 F.Supp. 710 (D.Kan. 1996) | 29 |
| Lardner v. FBI, Civil Action No. 03-0874 | 42 |
| Maryland Dept. of Human Resources v. Sullivan, 738 F. Supp. 555 (D.D.C. 1990) | 44 |
| *Nation Magazine, Washington Bureau v. United Sates Customs Service, 71 F.3d 885 (D.C.Cir. 1995) | 29 |
| *Nat'I Ass'n of Criminal Defense Lawyers, Inc. v. US. Dep't of Justice, 182 F.3d 981 (D.C. Cir. 1999) | 48 |
| Negli v. F.B.I., 658 F.Supp.2d 50 (D.D.C. 2009) | 36,43 |
| New York v. DeVecchio, 468 F.Supp.2d 448 (E.D.N.Y. 2007) | 5,7 |
| Orena  v. U.S., 956 F.Supp. 1071, (E.D.N.Y. 1997) | 38,41 |
| People v. DeVecchio, 845 N.Y.S.2d 676, 17 Misc.3d 990 (2007) 2007 N.Y. Slip Op 27440 | 7,57, 59 |
| People v. DeVecchio, 851 N.Y.S 2d 65, 2007 N.Y. Slip Op. 51962(U) 17 Misc.3d 1114(A) (2007) | 38 |
| People v. DeVecchio, 851 N.Y.S.2d 65, 17 Misc.3d 1114(A) (2007), 2007 N.Y. Slip Op. 51962(U). | 7 |
| Powell v. United States Dep't of Justice, 569 F. Supp. 1192 (N.D. Cal. 1983) | 46,48 |

<u>Page</u>

Pyramid Lake Paiute Tribe v. US Dept. of Justice, 750 F.2d 117     44
(D.C.Cir. 1984)

Rural Housing Alliance v. Dep't of Agriculture, 498 F.2d 73     53, 59
(D.C. Cir. 1974)

Tax Analysts v. I.R.S., 117 F.3d 607 (D.C.Cir.1997)     33

Tax Analysts v. U.S. Department of Justice, 759 F. Supp. 28     44
(D.D.C. 1991)

United States v. Persico, 1997 WL 867788 (E.D.N.Y.) at *10.     5, 38

U.S. v. Sessa, 2011 WL 256330 (E.D.N.Y.)     41

Washington Post v. U.S. Dep't of Defense, 789 F. Supp. 423     48
(D.D.C. 1992)

Weisberg v. United States Dep't of Justice, 489 F.2d 1195     52
(D.C. Cir. 1973)

Weisberg v. Dep't of Justice, 745 F.2d 1476 (D.C.Cir. 1984)     39

Window Third Oil and Gas v. Federal Deposit Ins., 806 F.2d 342     29
(10th Cir. 1986)

Cases chiefly relied upon are marked by asterisk (*).

## OTHER AUTHORITIES

28 C.F.R.

GLOSSARY

ADIC – Assistant Director In Charge

SAC – Special Agent In Charge

SSA – Senior Supervisory Agent

TE – Top Echelon

<u>NOT YET SCHEDULED FOR ORAL ARGUMENT</u>

===============================================

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA

=====================

D.C. CIR. NO. 16-5067

=====================

ANGELA CLEMENTE

Appellant,

v.

FEDERAL BUREAU OF INVESTIGATION, <u>ET AL</u>.

Appellees

=====================

United States District Court for the District of
Columbia, Hon. Richard J. Leon, District Judge

=====================

BRIEF FOR APPELLANT

_____

<u>STATEMENT OF ISSUES</u>

1.  Whether the District Court failed to ensure an adequate search for

responsive records by (a) initially improperly limiting the scope of plaintiff

Angela Clemente's <u>pro se</u> request for "the entire unredacted FBI Scarpa, Sr.

("Scarpa") file," (b) improperly continuing to restrict the scope of the request to a single file despite repeated showings that other FBI Head-quarters materials responsive to her request existed but had not been produced, (c) improperly ruling that two missing sections of the one FBI Headquarters ("FBIHQ") informant file which the FBI did locate but were "missing" because they had allegedly been transferred to the New York Field Office ("NYO" or "NYFO") were not within the scope of her request, and (d) improperly ordering Clemente not to again raise the issue of whether the scope of the request had been improperly limited;

2.   Whether the District Court improperly ruled that records pertaining to the collaboration of Top Echelon Mafia informant Gregory Scarpa, Sr. in a joint criminal enterprise with the FBI that murdered, maimed and falsely accused scores of innocent victims were "compiled for law enforcement purposes" under 5 U.S.C. § 552(b)(7)(E);

3.   Whether the District Court erred in denying Clemente's motions for an interim award of attorney fees, first in 2013 and subsequently in 2015, even though defendant Federal Bureau of Investigation did not contest either her eligibility for, nor entitlement to, an award of fees, except on the ground that any award of fees should await the termination of the case;

4.  Whether the District Court erred in sustaining certain exemption claims made pursuant to 5 U.S.C. §§ 552(b)(6), (b)(7)(C), (b)(7)(D) and (b)(7)(E);

5.  Whether the District Court erred in issuing an order forbidding Clemente from again raising the issues of (1) whether the scope of the request had been improperly limited, and (2) whether evidence that the compilation of the records requested was part of a joint criminal enterprise between the FBI and its Top Echelon Mafia informants thus vitiating its threshold defense that the records and information at issue was compiled for law enforcement purposes pursuant to 5 U.S.C. § 552(b)(7); and

6.  Whether the District Court improperly dismissed Clemente's case without considering whether other less severe sanctions were a more appropriate alternative.

## STATUTES AND REGULATIONS

The text of the Freedom of Information Act, 5 U.S.C. § 552, et seq. is reproduced in the appendix hereto at 1a-19a.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1292(a). The trial court had jurisdiction under 5 U.S.C. § 552(a)(4)(B).[1]

## STATEMENT OF THE CASE

### A. General Background

Plaintiff-Appellant Angela Clemente ("Clemente") is a forensic analyst who for more than a decade and a half has worked on the issue of systemic corruption of the law enforcement system resulting from the collaboration of the FBI and Top Echelon ("TE") informants working for it in murders and other crimes inflicted on innocent persons. To a large extent, her work has focused on the relationship between TE informant Gregory Scarpa, Sr. ("Scarpa") and former FBI Supervisory Special Agent ("SSA") Lindley DeVecchio ("Devecchio"), who was Scarpa's handler. Through her

---

[1] In *Brian Wrenn, et al. v. District of Columbia and Cathy Lanier*, this Court recently ruled that a senior district judge from another district had been assigned by the Calendar Committee to hear a case in the District of Columbia in violation of 28 U.S.C. § 294(c)-(d). The undersigned counsel feels obligated to notify this Court that the same or similar jurisdictional flaws that came to light in the *Wrenn* case may involve this case. Plaintiff takes no position on whether the District Court lacks jurisdiction to hear this case, but is notifying the Clerk of the Court and supplying him with he and former AUSA Mark Nebeker obtained from a clerk of the District Court.

independent research, Clemente has uncovered compelling evidence that

DeVecchio knew about several murders Scarpa committed while he was on

the FBI payroll as a Top Echelon informant. Either DeVecchio did nothing

in response or he actively assisted in the commission of these crimes by

providing Scarpa confidential law enforcement information concerning

them, such as letting Scarpa know the whereabouts of his eventual victims.

The Department of Justice ("DOJ") already has conducted two

internal investigations regarding SSA DeVecchio's alleged misconduct with

respect to Scarpa. In March 2006, a New York grand jury indicted

DeVecchio on four counts of second degree murder, charging that he aided

and abetted Scarpa, who actually committed the murders. See *New York v.*

*DeVecchio*, 468 F.Supp.2d 448, 451 (E.D.N.Y. 2007); *United States v.*

*Persico,* 1997 WL 867788 (E.D.N.Y.) at *10. Clemente subsequently

uncovered additional evidence of professional misconduct by DeVecchio

and others. She consulted with and provided information regarding these

matters to Senate investigators. Senator Charles ("Chuck") Grassley

referred her allegations to the Department of Justice's Office of the Inspector

General ('OIG'), and her allegations are currently being investigated by the

OIG. As a result of Clemente's investigation of Gregory Scarpa, Sr. which

began in or around 1999, Clemente "uncovered a pervasive pattern of

corruption in the New York Field Office ("NYO") of the Federal Bureau of

Investigation ("FBI").

Partly as a result of her two FOIA lawsuits,[2] three years ago Clemente

asserted that

> it is now clear that the scope of the corruption
> is much broader and deeper than I originally imagined.
> I now have evidence of at least three Top Echelon
> informants who participated in murders or other
> serious crimes while they were on the FBI payroll. I
> have confirmed 17 murders by Scarpa and 11 by Frank
> Sparaco, for a total of 28 in New York. The trial of
> James "Whitey" Bulger has identified 19 more. Thus,
> the evidence already established a great many innocent
> victims of these Top Echelon informants, and the
> disclosures I am now obtaining from the New York Field
> Office files may reveal still more.

August 12, 2013 Declaration of Angela Clemente filed in C. A. No. 13-

0108 ("2013 Second Case Clemente Decl."), ¶ 1.  See JA 648-649.  As will

become apparent below, there have been major new evidentiary and legal

developments in the three years since Clemente made these assertions that

further support her claims.


B.  Clemente's FOIA Request

---

[2] This appeal concerns the first lawsuit, *Clemente v. F.B.I.*, C.A. No. 08-1252; the second lawsuit is *Clemente v. F.B.I.,* C.A. No. 13-0108 (TFH).

This lawsuit concerns Clemente's attempts to obtain records pertaining to Gregory Scarpa, Sr., a Mafia hoodlum known as "The Grim Reaper" for the more than 50 people he is believed to have murdered.  His relationship with SSA DeVecchio and criminal proceedings growing out of that relationship set the stage for Clemente's FOIA requests.  DeVecchio was ultimately indicted for "committ[ing] second degree intentional murder in violation of New York Penal Law § 125.25(1) by aiding and abetting Scarpa in the murder of four individuals." *New York v. DeVecchio*, 468 F.Supp.2d 448, 450 (E.D.N.Y. 2007); *People v. DeVecchio*, 845 N.Y.S.2d 676, 17 Misc.3d 990 (2007), 2007 N.Y. Slip Op. 27440.   Charges against DeVecchio were ultimately dismissed after it was determined that chief prosecution witness Linda Schiro ("Schiro") had committed perjury,[3] and a special district attorney, former Judge Leslie Crocker Snyder ("Judge Snyder"), was subsequently appointed to investigate whether perjury charges should be brought against Schiro.

---

[3]The district attorney informed the court he intended to call DeVecchio's attorney as a prosecution witness after he learned DeVecchio's attorney had interviewed Schiro in the context of an investigation into DeVecchio's conduct which was being conducted by the FBI's Office of Professional Responsibility ("OPR"), and had advised her not to cooperate with the OPR investigation. *People v. DeVecchio*, 851 N.Y.S.2d 65, 17 Misc.3d 1114(A) (2007), 2007 N.Y. Slip Op. 51962(U).

On April 12, 2008, Clemente submitted a pro se FOIA request to FBI Headquarters seeking the "entire unredacted FBI file" regarding Scarpa. See Complaint, Exh. 1. JA 36. Clemente was assisting Judge Snyder in her investigation of the DeVecchio/Scarpa matter at the time she made her request. The pendency of proceedings regarding DeVecchio made it urgent that she obtain the records as soon as possible. Not having received any response from the FBI, she repeated her pro se request on May 21, 2008. Id., Exh. 2. JA 38. (This letter actually simply added the May 21, 2008 date to the April 12th letter, so both dates appear on it).

Clemente subsequently retained James H. Lesar to represent her. He advised her that in order to expedite access to the records she sought, she would need to submit a request limited to 500 pages or less. This would require the FBI to process it in its fastest processing queue. This was done by letter dated July 9, 2008 ("1st July 9th request"). Without withdrawing her broader, pro se request, she now requested just 500 pages, set forth in three items which sought:

(a) All records pertaining to Scarpa and Carlos Marcello;

(b) All records pertaining to any trip Scarpa made to Costa Rica; and

(c) All Scarpa records in any informant file in chronological order,

from the earliest through the latest date.

In addition to these three categories, Clemente also requested a fee waiver.  See First Amended Complaint, Exh. 4 ECF 4.  JA 40.

The same day she sent FBIHQ her 1st July 9, 2008 request limited to 500 pages she sent a second, much more detailed request which was intended to re-state in professional language Clemente's pro se requests for the "entire unredacted FBI file" on Scarpa.  Ultimately, the District Court ruled that the FBI had never received the 2d July 9 request.

C.  Proceedings in District Court

On July 21, 2008 Clemente filed her initial complaint, which was designed to achieve release of the 500 pages identified in her first July 9, 2008 request.  ECF #1, JA 30-42.  Before the FBI filed an answer, Clemente, having exhausted her administrative remedies, on August 20, 2008, filed her first amended complaint.  ECF # 4. JA 43. This added a second count for a waiver of copying fees pursuant to 5 U.S.C. § 552 (a)(4)(A)(iii).

By Order issued August 26, 2008, ECT # 5, the District Court directed the FBI to file a dispositive motion on or before September 22, 2008.  On September 7, 2008, ECF # 7, October 22, 2008, ECF # 9, the FBI moved for extensions of time to file their motion for summary judgment.  On

10

November 24, 2008, the FBI filed its motion for summary judgment ("MSJ"). ECF # 10.

On October 10, 2008, FBI Records Information Division Section ("RIDS") Chief David M. Hardy ("Hardy") responded to Clemente's request for a fee waiver. He stated that the FBI had located approximately 1,170 records potentially responsive to Clemente's request. He denied Clemente's request for a fee waiver. See Clemente's "Supplemental" or Second Amended Complaint, filed December 5, 2008, Exh. 7, ECF # 11. In line with his position that the entire file on Scarpa consisted of approximately 1,173 pages, he demanded Clemente pay $107.00 duplication charges, a sum more than double the amount that would have been due if the request at issue was limited to the 500 pages requested in Clemente's First July 9, 2008 request. Id.

On December 5, 2008, Clemente filed a motion for leave to file a second amended complaint. ECF # 11. By Memorandum Opinion and Order dated January 8, 2009, the Court granted Clemente's motion.

As the District Court noted, the amended complaint supplemented the original complaint in two ways. First, it described recent correspondence by Clemente regarding Clemente's application for a fee waiver. Second, a new Count III added a claim for potentially responsive records identified in the

FBI's October 10, 2008 letter, estimated at 670 pages which were not included in the initial disclosure of 500 pages. January 8, 2009 Memorandum and Order at 1. ECF # 16. JA 146.

The Court found that the FBI's objection that Clemente had not exhausted administrative remedies with respect to the additional 670 pages was "inapt" because she was not seeking to add a new claim or category of documents, but only to add a claim for additional records which the FBI already had identified as related to the subjects in Clemente's July 9, 2008 request. Id. at 2. The Court also rejected the FBI's claim that Clemente's motion to amend was "merely dilatory", saying that she had adequately explained "her reasons for not seeking to amend until now." Id.

The Court ordered the parties to meet, confer, and set forth a schedule which would identify the dates by which (1) the FBI "will review and disclose to Clemente all non-exempt portions of the remaining 670 potentially responsive pages"; (2) the FBI will supplement its motion for summary judgment; (3) Clemente will respond to the supplemental motion for summary judgment; and (4) the FBI will reply to Clemente's response. Id. at 3. JA 148.

By Minute Order entered February 4, 2009, the Court set forth a schedule for Clemente to respond to the FBI's pending summary judgment

12

motion, for the FBI to respond to Clemente's request for the remaining

documents responsive to her July 9, 2008, request, and for the parties to

submit supplemental memoranda regarding the FBI's pending motion for

summary judgment.

Clemente's Cross-Motion for Summary Judgment and Opposition to

the FBI's motion was filed on March 19, 2009. ECF # 25.  On April 6, 2009,

the FBI filed its reply to Clemente's Opposition. ECF # 28.  On April 22,

2009, Clemente filed her reply to the FBI's opposition to her cross-motion

for summary judgment.  ECF # 30.

On June 25, 2009 the FBI filed its supplemental motion in response to

Clemente's cross-motion for summary judgment. ECF #33.  On August 17,

2009, each party filed its opposition to the other's pending supplemental

motion for summary judgment. ECF #s 38, 39.  On August 27, 2009,

Clemente replied to the FBI's opposition.  ECF # 40.

On September 28, 2010, the District Court issued an Order, ECF # 41,

and Memorandum Opinion, ECF #42, which denied defendants' motion for

summary judgment with prejudice as to Count II and without prejudice as to

Counts I and III.  It granted Clemente's motion for summary judgment as it

applied to the fee waiver issue and directed the FBI to supplement its

*Vaughn* index. It also ruled that the FBI was entitled to summary judgment

on the adequacy of the search issue. *Clemente v. FBI*, 741 F.Supp.2d 64, 78, 88 (D.D.C. 2010). Lastly, the Court instructed the parties to file a Case Management Plan and Schedule for further proceedings on or before October 13, 2010.

On October 8, 2010, Clemente filed a motion for partial reconsideration. ECF # 43. On October 15, 2010, the FBI opposed to the motion. ECF # 45. On November 9, 2010, Clemente filed her reply. ECF # 48. On August 3, 2011, the Court issued a Memorandum Opinion and Order denying Clemente's motion for partial reconsideration. ECF # 61. JA 405.

In the interim, on October 15, 2010, the Court issued a Minute Order which set forth a schedule which provided for Clemente to select a *Vaughn* sample to review, for the FBI to re-index this supplemental index and move for summary judgment, to which motion Clemente would then respond.

On May 2, 2011, the FBI filed its second supplemental motion for summary judgment. ECF # 51. On June 22, 2011, Clemente filed her renewed cross-motion for summary judgment and her opposition to the FBI's second supplemental motion for summary judgment. ECF # 52. On August 26, 2011 the FBI filed its opposition to Clemente's renewed cross-motion for summary judgment, ECF # 63, and replied to her opposition to its motion. Also on August 26, 2011. Clemente filed her opposition to the FBI's motion.

14

ECF #64. On September 12, 2011, Clemente replied to the FBI's opposition to her renewed cross-motion for summary judgment. ECF # 67. On October 26,2011, Clemente moved for leave to file a supplemental memorandum, ECF # 69, which the Court granted on November 8, 2011. On December 8, 2011, the FBI filed its reply to Clemente's supplemental memorandum. ECF # 76. Thereafter, Clemente filed a surreply on December 20, 2012. ECF # 78.

On April 13, 2012, the District Court issued a Memorandum Opinion granting the FBI's motion for summary judgment in part and denied the remainder. It denied Clemente's motion for summary judgment without prejudice. ECF # 81, published as *Clemente v. F.B.I.,* 854 F.Supp.2d 49 (D.D.C. 2012)( *"Clemente II")*. Relying on *Fischer v. U.S. Dep't of Justice,* 596 F.Supp.2d 34 (D,D.C. 2009), the Court ruled that the FBI did not have to search for two sections of the FBI Headquarters file on Scarpa which had allegedly been transferred to a NYFO file on Scarpa. Id. ECF # 81 at 12-14; 854 F.Supp. 2d at 57.

In support of its renewed motion for summary judgment, the FBI submitted a *Vaughn* index consisting of 192 pages out of a total of 1,153. Id. Judge Friedman had instructed the FBI "not to withhold references to the number of FBI informants reporting on Mafia issues if those references were

'of only historical significance,' *Clemente v. F.B.I.*, 741 F.Supp.2d 64, 82-83

("*Clemente I*") nor references to dispensation of operational funds,' id. at

83." *Clemente II*, 854 F.Supp.2d at 59. Of the 192 *Vaughn* sample docu-

ments, the FBI disclosed the sums dispensed as operational funds in fifty-

one documents. Id., citing 4th Hardy Decl,, ¶ 11, n.2. ECF #51-1. The

number of informants reporting on Mafia issues was disclosed in eleven

sample documents. But the FBI only released information from these

categories that were from the *Vaughn* sample. It did not release information

from the non-sample documents. The Court held, however, that its holding

applied "to the entire set of responsive documents." *Clemente II* at 59-60.

Thus, the FBI was required to re-process all of the non-sample documents

for additional information falling within these categories which Judge

Friedman had instructed be released.

The information from these categories did not constitute all of the

information in the *Vaughn* sample that was released. "The FBI made

twenty-six additional disclosures from twenty-three documents in the

representative sample[,]" which it described as "discretionary releases,"

Id., at 58, quoting 4th Hardy Decl., ¶ 10. These "discretionary disclosures"

"included the names of fifteen deceased individuals contained in twenty-one

documents, as well as the names of Scarpa's wife and eldest son, which the

16

FBI determined to be part of the public record, a 'technical source symbol number,' 'information regarding [an] informant's position within [the] organization and the resulting information provided by the informant,' each of which was released from one sample document, and 'identifying information regarding [a] payment pick-up location,' which was released from two." Id.

The Court noted that although the FBI did not "explicitly concede that these documents were improperly withheld, it describes the releases as having been made "in response to this Court's Memorandum Opinion of September 28,2010," Id., citing Defs' Reply. ECF # 63 at 2.  And the Court found that "[t]here is no merit to the FBI's argument that Judge Friedman's decision in this case was the sort of 'post-response occurrence' that should not trigger 'judicially mandated reprocessing.'" Id. at 59, citing *Banner*, 928 F.2d at 1152. As a result, "[t]hat information must be released from all responsive documents." Id. (emphasis in original).  The Court concluded that the assumption of the *Vaughn* sampling technique--that all documents have been handled in the same way--had "been frustrated here, because the FBI has released certain types of information from the sample documents while withholding it from the rest." Id.  In light of this, this Court "order[ed] the

non-sample documents to be reprocessed so that all nonexempt information can be released to Ms. Clemente." Id.

On January 22, 2013, the Court ordered the parties to report on the status of the case. The parties' February 1, 2013 Joint Status Report stated that the FBI had reprocessed 1,153 pages and released them to Clemente on August 1, 2012. ECF # 84. The FBI represented that it released the non-exempt material in these pages consistent with the Court's April 13, 2012 order. ECF # 81. In addition, it represented that it had "checked the life status of all individuals within the release." ECF # 84 at 1. The report also stated that Clemente had informed the FBI that she was seeking an interim award of fees, which issue "the parties are attempting to resolve. . . before [Clemente] decides which issues, if any, she wishes to further litigate." Id. The parties filed another Joint Status Report on April 25, 2013, which stated the FBI's belief that an interim fee request was "premature," it being appropriate "to resolve the issue of attorney fees at the conclusion of the case." Therefore, the FBI "will oppose any motion for interim attorney's fees and intends to seek final resolution of the merits of the case by renewing its motion for summary judgment." ECF # 85 at 1.

On August 30, 2013, the Court instructed plaintiff "to notify the Court, of any remaining issues in this case within fourteen (14) days of the

18

date of this order." ECF # 98 at 1.  Clemente complied with this order. <u>See</u> Clemente's Notice of Remaining Issues. ECF # 99.

Subsequently, on November 14, 2013, the FBI filed its Second Renewed Motion for Summary Judgment ("2d RMSJ"). ECF # 105. On February 7, 2014, Clemente filed her Opposition to the FBI's 2d RMSJ. ECF # 112.  On March 28, 2014, the FBI filed its Reply to Clemente's Opposition to its 2d RMSJ. EOF #115.  On May 8, 2014, Clemente moved for leave to file a Surreply, ECF # 116, and the following day she filed a Notice of Filing of the Surreply.  ECF # 117.  On July 23, 2014, she noticed the filing of a Supplemental Memorandum.  ECF # 118.  On August 4, 2014, Clemente filed a Supplemental Declaration.  ECF # 119.  On August 18, 2014, the Court issued an Order Granting in Part and Denying in Part Defendants' Second Renewed Motion for Summary Judgment ("Aug. 18, 2014 Order").  ECF # 121.  The Court also denied Clemente's Motion for Leave to File a Surreply.  ECF # 121.

The District Court ruled that the FBI's search was adequate.  ECF # 121 at 6.  With respect to exemption claims, it upheld the FBI's contention that it had met its threshold burden of proof under Exemption 7. <u>Id</u>. at 7-8. With respect to Exemption 7(C), however, the Court found that the dispute over it had "dwindled down to this: (1) did the FBI sufficiently attempt to

ascertain the life status of the individuals whose information has not been released, and if so, (2) does the privacy interest of said individuals outweigh the public interest in disclosure, and (3) did the FBI disclose all nonexempt, segregable information on Documents 404, 418, 703, 744, 924, and 942."

As a result of this additional records were released

## D.  Motions for Interim Award of Attorney Fees and Costs

### 1.  Administrative Request for Award of Interim Fees

By letter dated November 27, 2012, Clemente's counsel, James H. Lesar, wrote the FBI's then counsel, AUSA Tricia Francis, requesting an interim award of attorney's fees. Lesar attached a detailed itemization of his time to his fee application. When Lesar learned that AUSA Francis was being replaced, he re-submitted the attorney fees application by email to AUSA Andrea McBarnette on January 31, 2013.

In their Joint Status Report filed February 1, 2013, the parties repre-sented to the Court that Clemente had informed the FBI that she was seeking an interim award of attorney fees, and that "[t]he parties are attempting to resolve this interim fee issue before [Clemente] decides which issues, if any, she wishes to further litigate."  ECF # 84.  By email dated March 12, 2013, AUSA McBarnette advised Lesar that the FBI had completed its work on the case and intended to renew its motion for summary judgment. She inquired

20

as to Clemente's position on the motion.  Lesar responded by advising

McBarnette that Clemente would oppose the FBI's motion and would move

for a stay of proceedings on the motion pending resolution of a motion for

an interim award of attorney's fees.

In the parties' Joint Status Report filed April 25, 2013, the FBI again

represented that it had completed processing Clemente's request.  The report

also noted that Clemente had informed the FBI that she seeks interim attor-

ney fees and intends to file a motion for such fees by May 15, 2013.  The

report further represented that the FBI "believes that such a request would be

premature" and that it contended that it was "appropriate to resolve the issue

of attorney fees at the conclusion of the case."  The report stated that the FBI

would oppose any motion for interim attorney fees and intends to seek final

resolution of the merits of the case by renewing its motion for summary

judgment."  April 25, 2013 Joint Status Report at 1. ECF # 85.  The FBI

never responded to the attorney fee application which Lesar submitted by

letter dated November 27, 2012.

## 2. Clemente's First Motion for an Award of Interim Fees

Accordingly, on May 23, 2013, Clemente submitted a motion for an

award of interim fees ("Mot. Interim Fees").  ECF # 88.  On May 28, 2013,

the FBI moved for an extension until August 2, 2013, to respond to

Clemente's motion, ECF # 89, which was granted by Minute Order issued

May 29, 2013. On August 2, 2013, the FBI filed its opposition to

Clemente's motion. Clemente filed her reply on August 14, 2013. On

August 30, 2013, this Court issued its Order Denying Plaintiff's Motion for

an Interim Award of Attorney's Fees and Costs ("Order Denying Interim

Fees"). ECF # 98.

Clemente's motion for an interim award of fees contended that (1)

Clemente had "substantially prevailed" and thus was eligible for an award of

fees, Mot. for Interim Fees at 10-14; (2) the "four-factor" test for evaluating

entitlement to an award of fees under the FOIA strongly favored such an

award, id., 14-18; and (3) that interim award of fees was appropriate under

any and all of the different D.C. Circuit decisions regarding the award of

interim fees in FOIA cases. Id., 18-25.

Clemente stated that her financial and personal situation had worsened

since she filed suit. She was terminally ill and prospects for a liver transplant

remained bleak. She was unable to pay her attorney for the work he does.

May 21, 2013 Declaration of Angela Clemente, ("1st 2013 Clemente Decl.").

Her attorney represented that he has only a small Social Security check as

regular income and meager retirement funds. Declaration of James H. Lesar

in Support of Motion for an Award of Attorney's Fees ("Lesar Decl"), ¶¶ 7.-

9. ECF # 88-1. Because of these circumstances, he does not have a secretary

or office assistant, nor does he subscribe to WestLaw or LexisNexis, which

have become vital to legal research. Id. ¶ 15.

On August 2, 2013, the FBI filed its Opposition ("Opp.").  ECF # 91.

The FBI did not address Clemente's claims that she had substantially

prevailed and was entitled to fees.  Relying on the "four policies" set forth in

*Allen v. F.B.I.*, 716 F.Supp. 667 (D.D.C. 1989), the FBI argued that interim

fees were not appropriate under these criteria.  It incorrectly asserted that

Clemente's motion discussed "merely a general hardship for FOIA

requesters but no new circumstances that justify this interim fee request."

Opp. at 4

### 3. The District Court's Denials of Motions for Interim Awards

On August 18, 2014, the District Court denied Clemente's first motion

for an award of interim fees without prejudice to its renewal if proceedings

proved protracted. Two years later she again denied interim fees. As the

details regarding these denials and what ensued are set forth in Part III of the

Argument, they will not be related here.

## SUMMARY OF ARGUMENT

This is a Freedom of Information Act lawsuit brought by Angela Clemente, a forensic analyst, who specializes in studying cases of systemic failures involving criminal justice. Faced with an urgent need to obtain records on Gregory Scarpa, Sr., a Top Echelon ("FE") Mafia informant and Senior Supervisory Special Agent ("SSA") Lindley DeVecchio, Clemente submitted two identical pro se requests in April and May, 2008 for the "entire UNREDACTED FBI file" on Scarpa. JA 36, 38. Receiving no response from FBIHQ, Clemente retained the services of attorney James H. Lesar. Lesar advised her that the most expeditious way of obtaining the records of greatest interest to her was to limit the initial request to 500 pages, thus enabling it to be processed immediately as part of the FBI's "short hit" processing queue.

The first July 9, 2008 request was not only limited to 500 pages but unlike Clemente's pro se request, it was restricted to three subjects, including records from any informant file on Scarpa. JA 40. The same day, Clemente's counsel submitted a second July 9 request to FBIHQ. JA 143. This 2d July 9 request was designed to state, in much more detailed

professional language, Clemente's pro se request for the "entire

UNREDACTED FBI file" on Scarpa.

These requests were promptly followed by a lawsuit which ultimately

proved highly successful, producing the release of more than 1,000

extremely illuminating records from Scarpa's alleged informant file. Over

the years, the litigation has also resulted in several major legal issues which

remain unresolved.

### A. Scope of the Request; Adequacy of the Search

The scope of FOIA requests is to be liberally construed. The FBI

claimed that it had not received the all-encompassing 2d July 9, 2008

request. The District Court accepted this without requiring the FBI to

conduct the kind of search or discovery needed to resolve it. Clemente

contended her original pro se sought all records on Scarpa, but this claim

was disregarded. FBI Headquarters did not produce all kinds of records that

plainly fall within the scope of a request for the entire body of records on a

given subject. Cross-references were not provided, electronic surveillance

materials were not provided, and two entire sections of the FBI Headquarters

alleged "informant" file on Scarpa were not produced. The District Court

ruled that since they were in New York, not at FBI Headquarters, they need

not be produced. The District Court also ruled that an unspecified volume of

records represented by a "changed to" placeholder at FBIHQ had been "mis-indexed" in 1983 and sent to their appropriate location. He held that they were "non-responsive" records. The FOIA requires, however, that all records within the scope of a request be produced and released unless they are subject to one of the Act's nine exemptions or an exclusion.

During the course of the litigation, evidence surfaced concerning the failure to produce a number of other records within the scope of the request, including a 550-page report by the FBI's Office of Professional Responsibility, records relating FBI Director J. Edgar Hoover's sending Scarpa to Jacksonville, Mississippi to brutalize and extract confessions from people who may have been involved in the murder of civil rights workers and other in the South.

### B. The District Court Twice Denied Clemente's Applications For an Interim Award of Attorney Fees and Costs

After five years of intense but quite successful litigation in which Clemente repeatedly "substantially prevailed," she filed a motion for an interim award of attorney fees. The FBI stalled in responding to Clemente's administrative application and motion. It initially refused to take a position on whether Clemente was eligible for and entitled to an award of fees. It insisted both in the initial 2013 motion for interim fees, and again more than two years later, in 2015, that it would not pay fees until the case was over.

The FOIA provides that reasonable attorney fees may be awarded in any case in which the complainant has substantially prevailed.  Clemente had plainly substantially prevailed when she made her initial motion for an award, and more so when she made her second motion.  The District Court, however, erected hurdles to interim fees by basing her decisions on "four-factors" which she mistakenly represented as being the law of D.C. Circuit. In fact, the case relied upon was a District Court case, *Allen v. F.B.I.*, 716 Supp. 667 (D.C.Cir. 1989) which in <u>dicta</u> cited four factors which a New York District Court had offered as guidance for other courts to consider.

Aware of the fact that some District Courts had discussed the "four-factors" as relevant considerations, Clemente did address the financial hardship consideration.  The District Court brushed aside the fact Clemente's counsel was representing an impoverished, terminally ill client on a contingent fee basis, saying it was irrelevant.  She dismissed concrete examples of significant operational expenses, saying they were not tied to the particular case in front of her.  And she disparaged the veracity of Clemente's counsel, saying she doubted the veracity of his statements that in prior years he had suffered net financial losses in the tens of thousands of dollars.

Both in 2013 and again in 2015, the Court's decision to deny fees was grounded on her beliefs that there was no hardship to Clemente or her counsel in further delaying possible payment of fees, and that in any event the case was almost over. The Court's rulings were an abuse of discretion. The FOIA attorney fees statute does not require any showing of financial hardship to warrant an award of attorney fees. If there is any such require-ment, it does not go beyond the hardship which necessarily inheres in contingent fee representation. And if more than contingent fee representation is required, the District Court improperly rejected the evidence of financial difficulties which Clemente's counsel adduced.

C.  The FBI Failed to Show That the Records at Issue Meet Exemption 7's "Threshold" Test and Were "Compiled for Law Enforcement Purposes"

The FBI has withheld information pursuant to Exemptions 7(C), 7(D), and 7(E), 5 U.S.C. §§ 552(b)(7)(C), 7(D), and 7(E). Before these provisions may be invoked, it must show that such information was "compiled for law enforcement purposes." The FBI has failed to meet this threshold test.

The District Court rejected as "unpersuasive" Clemente's argument that the Scarpa informant file information was not compiled for law enforcement purposes because Scarpa had engaged in illegal activities at the behest of the FBI. To the contrary, the evidence indicates that Scarpa and

the FBI were engaged in a joint criminal enterprise in violation of the law.
Assistant District Attorney Ann Bordley set forth the evidence in an affidavit
filed in a case against Senior Supervisory Agent R. Lindley DeVecchio
brought in Kings County, New York. She states that "[f]rom approximately
1978 to 1992, Scarpa paid [DeVecchio] for information about the [FBI's]
investigation of organized crime. Affidavit of Ann Bordley ¶ 7. JA 274.
The FBI was also paying Scarpa large sums of money for information on the
Mafia at the same time he was involved in rampant criminal activities, in
clear violation of the FBI rule under which a confidential informant "is not
permitted to participate in any criminal activities [] in the absence of prior
written authorization from F.B.I. supervisors." Bordley Aff., ¶ 9. JA 275.

DeVecchio and Scarpa used information acquired as a result of their
relationship to jointly engage in felonies. Thus, when Scarpa wanted to
murder Lorenzo Lampasi, he asked DeVecchio to get him information on
Lampasi, "including the address where Lampasi was living and the time that
Lampasi left his house for work in the morning." Id., ¶ 34. JA 281.
DeVecchio obtained the information from "[l]aw enforcement agencies
[which] had conducted physical surveillance on Lampasi at his home" and,
supplied with this information, Scarpa and his hit team planned and then
murdered Lampasi. Id., ¶¶ 35-40. JA 281-283.

## ARGUMENT

I.    The FBI Failed to Meet its Burden to Conduct an Adequate
      Search for Responsive Records

   A.  Summary Judgment Principals and the Law Governing
       The Adequacy of Agency Searches

Summary judgment is proper where the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine

issue as to any material fact in dispute and that the movant is entitled to

judgment as a matter of law.  Fed.R.Civ.P. 56(c).  At summary judgment a

court must draw "all justifiable inferences" in the nonmovant's favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, (1986).   "A summary

judgment motion does not empower the court to act as a jury and determine

witness credibility, weigh the evidence, or choose between competing

inferences."  *Knight v. Food and Drug Admin.*, 938 F.Supp. 710, 715

(D.Kan. 1996), citing *Window Third Oil and Gas v. Federal Deposit Ins.*,

806 F.2d 342, 346 (10th Cir. 1986).

   The scope of the request is critical to assessing the adequacy of the

search.  "To assess the adequacy of [an agency's] search, we must first

ascertain the scope of the request itself."  *Nation Magazine, Washington

Bureau v. United Sates Customs Service*, 71 F.3d 885, 889 (D.C.Cir. 1995).

30

An "agency also has a duty to construe a FOIA request liberally." Id. at 890 (citations omitted).

### B.  The District Misconstrued the Scope of the Request

### 1.  The Scope of the Request Included "The Entire UNREDACTED FBI File on Scarpa"

Here, the Court improperly determined the scope of the request to be restricted to the first July 9, 2008 request submitted by Clemente's new counsel, James H. Lesar.  That request limited what she was seeking to 500 pages because that was the only way she was going to be able to expedite the release of records she urgently needed.  JA 40.  However, she did not withdraw her April 12 and May 21, 2008 pro se requests in which she sought "the entire unredacted FBI file regarding Top Echelon Mafia informant Gregory Scarpa, Sr.  Unlike her first July 9th request, which directed the FBI to provide specified pages from any informant file on Scarpa, the April 12/May 21 requests were not limited in this way.  Although phrased in a laywoman's terms, the plain meaning of these requests was pellucid.  Clemente wanted everything the FBI had on Scarpa.

Counsel for Clemente limited the first July 9 request to 500 pages so that Clemente could receive materials of urgent interest to her as soon as possible.  To avoid the possibility that these 500 pages would include materials of less urgent interest, he restricted the request for materials on

Scarpa to any Scarpa informant file. This restriction was not in Clemente's

original pro se requests. Very much aware of the roadblocks the FBI

customarily erects against FOIA requesters trying to get all records on a

given subject, he immediately drafted a second FOIA request that same day

that in professional language requested all the records on Scarpa that

Clemente had initially requested and continued to seek.

In a couple of significant respects, the FBI's subsequent actions

indicate that it did not treat Clemente's first July 9, 2008 request as having

supplanted her April/May 2008 requests for all records on Scarpa. Rather

than limiting their response to 500 pages, as that interpretation would

dictate, they produced approximately 1,170 pages. In addition, they sought

to charge Clemente $107 for the copies, far more than they would have

charged her if they had interpreted the 1st July 9 request as the only viable

request.

In construing a FOIA request, "the agency must be careful not to read

the request so strictly that the requester is denied information the agency

well knows exists in its files, albeit in a different form from that anticipated

by the requester. To conclude otherwise would frustrate the central purpose

of the Act." *Hemenway v. Hughes*, 601 F. Supp. 1002 (D.D.C. 1985). Here,

despite Clemente's direct and unequivocal statement that she wanted

everything, the FBI applied an interpretation of the scope of her requests that was severely limited. First, the FBI limited her request to informant files, even though she had not so limited her April/May 2008 FOIA requests and did not so limit her 2nd July 9 request. JA 143.

### 2. Two Placeholder Cards Show That the FBI Failed to Produce Two Entire Sections of the FBI Headquarters Alleged Informant File on Scarpa Which Are Clearly Within the Scope of Clemente's Request

In the process of doing its first supplemental *Vaughn* index, the FBI belatedly disclosed that two entire sections of its so-called "informant" file on Scarpa allegedly had been transferred to the NYO. Two placeholder cards indicated the transfer of Sections 3 and 4 of this file to the NYO.

These placeholders are particularly significant for several reasons. First, they represent the transfer of entire sections of the FBIHQ file 179-1996 to a New York field office file whose file number was universally redacted because it is a confidential source code file number. The FBI customarily places 200-300 pages in each file section. This constitute a large amount of missing material that clearly was within the scope even of Clemente's limited 1st July 9 request.

The placeholder cards, CL 665 and CL 1148 which are reproduced as Exhibit 2 to Pl's RMSJ show that these two sections were transferred to NYO. Secondly, the date of transfer is significant. Placeholders 665 and

918 show that Sections 3 and Section 4 of FBIHQ file 179-1996, became part of Scarpa's "New York Field Office informant file when they were transferred to it on December 28, 1994." <u>See</u> 4th Hardy Decl., ¶ 12. This is of interest for two reasons; first, it occurs <u>after</u> Scarpa's death. Second, two transferred sections appear to cover the period that the Colombo War was waged during the early 1990s. This was a period in which Scarpa was at the height of his activities and appears to have been receiving greatly increased sums of payments from the FBI. Indeed, CL 1102, dated September 25, 1991, states that Scarpa's "total authorization level is now $148,400." This is far in excess of what CBS reported Scarpa had been paid in its May 22, 2011 "60 Minutes" interview of him.

The District Court ruled that Clemente's claim that these two volumes and a third record should be provided were "without merit." Judge Friedman because the request was submitted to FBIHQ, not the NYO, the FBI was not required to "locate, retrieve or release" them. *Clemente v. F.B.I.*, 741 F.Sup. 23 at 80. He relied first on 28 C.F.R. §§ 16.3. 16.41. However, courts "owe no particular deference" to an agency's interpretation of what FOIA requires. *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1313 (D.C.Cir.2003), citing *Tax Analysts v. I.R.S.*, 117 F.3d 607, 613

(D.C.Cir.1997) (noting that court "will not defer to an agency's view of FOIA's meaning").

For case law, the District Court cited *Fischer v. U.S. Dep't of Justice*, 596 F.Supp.2d 34. 37, n.9 (D.D.C. 2009). But *Fischer*, a District Court case, is inconsistent with the D.C. Circuit's decision in *Campbell*, which sets forth the governing D.C. Circuit precedent. *Campbell* held that the FBI's claim that its search obligation was limited to the "main" files located through a search of its Central Records System ("CRS") was not supported by existing authority. Rather, "such authority indicates that the FBI must search ELSUR in addition to CRS in response to a general FOIA request for which ELSUR may be relevant." *Campbell*, supra, 164 F.3d at 28. In *Campbell*, The requester submitted his request to the NYO. It was unclear whether NYO did a search of its ELSUR index; however, the Court of appeals held that this was not material "because even if the New York office had searched its ELSUR index the national office would still have been obliged to search its own index if it had cause to believe that such a search would identify responsive information." The converse is equally true.

CL1050 states of Scarpa: "For the past several years source has provided a continuous flow of extremely singular information which led to 17 Title III intercepts and reauthorizations forming the basis for the prose-

cution of the hierarchy of the Colombo family." 4th Clemente Decl., ¶ 20,

Exhibit 5.  As Clemente notes, "[t]his clearly indicates the existence of

electronic or video surveillance materials pertinent to my FOIA requests

which have not been provided to me." Id.  CL 1050, ECF 57-3, Exh. 5.

JA393, comes from HQ file CL 1102, dated September 25, 1991, which

states that Scarpa's "total authorization level is now $148,400," which is far

in excess of what CBS reported Scarpa had been paid in its May 22, 2011

"60 Minutes" piece 79-1996.  These surveillances, however, took place in

New York City and Scarpa participated in them as NY-3461-TE.   Some of

these surveillances were recently shown on the 60 Minutes program on May

22nd regarding DeVecchio's book.

        There was a third "missing document in the FBIHQ "informant"

File.  It was CL 918, a "change to" sheet.  The District Court simply

accepted the FBI claim that it represented a document that had been "mis-

indexed in Scarpa's informant file and transferred to "the appropriate file."

Disposing of a disputed issue of material fact, the District Court agreed with

the FBI that if was not responsive to Clemente's request.


        C.   Flaws in the FBI's Search

        1.  Limitation of Search to Computerized Digital Index

Second, the FBI limited its search to a "computerized digital" index,
*Clemente I* at 78, even though the FBI has many other relevant indices,
including manual indices and a digital index that is full-text searchable. See,
*Negli v. F.B.I.*, 658 F.Supp.2d 50, 57 n.3 (D.D.C. 2009), listing nine sources
of searchable records maintained by the FBI. The FBI's Automated Case
Support System ("ACS") is comprised of three "automated applications"
which are digitally searchable. The FBI's searches are done under the
Universal Index ("UNI") application, in which the indexing is discretionary.
The Electronic Case File ("ECF") application, on the other hand, is "full-text
searchable." Id. While the First Hardy Declaration mentions the ECF at ¶
18(b), Hardy does not state that it was searched.

### 2. Failure to Search Files of Assistant Directors

In determining what is a reasonable search, an agency must take into
account leads that emerge during its inquiry. "Consequently, the court
evaluates the reasonableness of an agency's search based on what the agency
knew at its conclusion rather than what the agency speculated at its incep-
tion." *Campbell v. United States Dept. of Justice*, 164 F.3d 20, 28 (D.C. Cir.
1998). Here, the FBI knew that Clemente wanted far more than was request-
ed by her 1st July 9 request. Even if constrained to the Headquarters infor-
mant file it produced, the FBI had to know that she was seeking far more

than just the materials that were given her. For example, the documents from that file which the FBI released show that some records were distributed to a "tickler." The D.C. Circuit has found that references to ticklers required the FBI to conduct a search for them, regardless of whether their continued existence had been established. Id. Ticklers were customarily maintained in office safes and file drawers of high level FBI officials and supervisors. Although the FBI has continued to delete the names of many of these officials, it is now indisputable that one of the FBI Assistant Directors involved in this case was John Mohr. No search of his files or of the files of other Assistant Directors has been conducted.

### 3. Failure to Search Electronic Surveillance ("ELSUR") Indices

The FBI did not search the electronic surveillance indices on Scarpa. Scarpa's job involved conducting surveillance operations, and the documents in his informant file indicate frequent distribution of files to Assistant Director John Mohr, who was in charge of providing electronic surveillance equipment. The FBI's invocation of Exemption 7(E) clearly relates to keep secret materials involving electronic surveillance. For example, the 5th Hardy Decl., ¶ 10(iv), refers to "use of specific equipment in surveillance and undercover operations" and ¶10(vi) refers to "special investigative techniques used to conceal devices used in the investigation to gather

information."  Given this information in its files, the FBI was obligated to conduct a search for ELSUR records pertaining to Scarpa.  See *Campbell*, 164 F.3d at 28 (citations omitted):  "In fact, such authority indicates that the FBI must search ELSUR in addition to Central Reference System (" CRS") in response to a general FOIA request for which ELSUR may be relevant."

### 4. The FBI Failed to Search Cross-References

Because of the way the FBI's indexing system is set up, it has inherent knowledge that any request for all records on that subject, must include a search of cross-references in order to be complete.  Yet the FBI did not search cross-references in this case.  That there had to be very important records pertaining to Scarpa in any search of cross-references is evident from the fact that Scarpa figured heavily in a trial in New York against SSA Lindley DeVecchio.  There have to have been extensive references to DeVecchio in the cross-references on Scarpa.  The Scarpa/DeVecchio connection was extensively reported in several court decisions.  See e.g., *People v. DeVecchio*, 851 N.Y.S 2d 65, 2007 N.Y. Slip Op. 51962(U), 17 Misc.3d 1114(A) (2007); *Orena v. U.S.*, 956 F.Supp. 1071, 1088-1090 (E.D.N.Y. 1997); *U.S. v. Persico*, 1997 WL 867788 at * 12-13 (E.D.N.Y.), citing Orena trial transcript at 5210.

### 5. Scarpa and the Mississippi Civil Rights Workers

In opposing the FBI's claim that it had produced all the records on

Scarpa, Clemente initially pointed to some gaps in the record which

suggested that records should have been created but were not produced by

the FBI. Judge Friedman dismissed Clemente's claim that the FBI's search

was inadequate "because it did not yield the records she expected." He used

the familiar legal maxim that "'[t]he adequacy of a search is not determined

by its results, but by the method of the search itself.'" *Clemente I* at 79,

quoting *Harrison v. Fed. Bur. of Prisons*, 681 F.Supp.2d 76, 81-82 (D.D.C.

2010), citing *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C.Cir.

1984). But circumstances sometimes erode the value of this theorem as a

reliable determinant of the adequacy of a search. The undersigned counsel

represented Harold Weisberg in his Civil Acton 75-1996 lawsuit against the

FBI for records on the assassination of Dr. Martin Luther King, Jr., includ-

ing crime scene photographs. The FBI claimed it had conducted a thorough

search and didn't find any, despite the fact that there were public reports of a

photographer hired by the Justice Department who had been at the King

assassination crime scene taking photos. The absence of results did not

validate the adequacy of the FBI's search method; rather, it indicated that the

FBI's search method was inadequate either because the FBI did not conduct

the kind of search required to locate the records or because it lied about what

it found.  Ultimately, it released over 200 crime scene photographs to Weisberg.

Clemente is now able to provide new information that indicates the inadequacy of the FBI's search for these records.

One major gap in Scarpa informant file concerns at least one trip Scarpa took to Mississippi at the request of the FBI to assist in the investigation of the murder of three civil rights workers, Andrew Goodman, Michael Schwerner, and James Chaney.  Despite extensive national publicity and high level governmental attention, the FBI released only one record to Clemente concerning this matter, a memorandum from FBI Headquarters to the NYO indicating there was an issue in Mississippi where FBIHQ believed informant Scarpa might be able to provide assistance.  Defendants released no documents regarding Scarpa's activities in Mississippi, despite the fact that evidence in the public domain, including information in reported case law, confirms that Scarpa did travel to Mississippi on a mission for the Government relating to the civil rights murders.  Clearly, there are more records pertaining to Scarpa's trips to Mississippi.  On July 23, 2014, Clemente filed a Notice of Filing, ECF #118, which called attention to a number news stories regarding Scarpa's activities and reproduced several FBIHQ documents.  The articles and FBI records are reproducded at JA 535-

41

557. While the legibility of the FBI documents as reproduced here is bad, the Notice of Filing which they are attached to sets forth the significant details they provide.

In addition, federal courts in New York which have addressed allegations of improprieties in the relationship between agent DeVecchio and Scarpa have explicitly mentioned Scarpa's role in the Mississippi investigation. See *Orena v. U.S.*, 956 F.Supp. 1071, 1086 (E.D.N.Y. 1997) (". . . [E]arlier the F.B.I. reportedly had enlisted Scarpa to help break the silence of the Mississippi Ku Klux Klan in relation to the disappearance of three civil rights workers. Scarpa is said in unconfirmed rumor to have acquired information the Bureau desired after kidnapping a Klansman and intimidating him with a gun supplied by the F.B.I."). See also *U.S. v. Sessa*, 2011 WL 256330 (E.D.N.Y.), citing *Orena* at 1086. In addition, one of the individuals convicted of complicity in this crime, Edgar Ray Killen, filed a federal civil rights complaint, alleging, *inter alia*, that "[t]he FBI employed George [sic] Scarpa, Sr., an organized crime figure, and paid him at least $30,000 to locate the victims' bodies and otherwise obtain evidence for the prosecution of the crimes. Mr. Scarpa's tactics included 'intimidation of potential witnesses, pistol-whipping actual witnesses, and assaulting other local residents.'" *Killen v. Hood et al.*, 2011 WL 1103150 at *2. Further,

Scarpa's girlfriend Linda Schiro testified in open court that Scarpa had

kidnapped a klansman in Mississippi and put a gun in his mouth to force him

to talk about the crime.  Given this background it is not credible that the FBI

has no records pertaining to this matter at FBIHQ.  At the very least

sufficient evidence of a disputed issue of material fact exists to warrant

discovery being taken on this matter.

### 6. More New Evidence of Inadequate Searches

More new evidence of inadequate searches has recently come to light as a

result of revelations made by Judge Korman in New York. For details on

these revelations, see ECF #158-2, July 18, 2016 Clemente Declaration and

the attachments thereto (JA 687-824).

### 7. The FBI's Affidavits Attesting to the Adequacy of Its Lack Of Credibility

Fundamental to the affidavits submitted by the FBI in this case (and

others) is their lack of credibility on the search issue.  In *Lardner v. F.B.I.*.

Civil Action No. 03-0874, SA David M. Hardy submitted a declaration

attesting to the fact that no ELSUR indices existed prior to January 1, 1960.

This is a claim that the FBI had been making for decades in affidavit after

affidavit.  As counsel for George Lardner, the plaintiff in that case, I did not

believe it and presented arguments why it should not be believed.

Ultimately, in 2009, the FBI filed a declaration by another agent admitting

that the FBI had discovered seven boxes of pre-1960 index cards.
Ultimately, it turned out, according to the FBI, that some 5,000 index cards
were post-1970 index cards. Thus, for decades FOIA requesters have
repeatedly been denied access to these records, which are sure to contain
valuable information on organized crime figures like Scarpa. A request the
undersigned counsel made for these cards several years ago still has not been
responded to.

As noted above, in *Negli v. F.B.I.*, 658 F.Supp.2d 50, 57 n.3 (D.D.C.
2009), the District Court the FBI admitted to having nine different records
locations potentially holding records responsive to that plaintiff's request.
One that seems especially likely to hold records responsive to Clemente's
request for records on Scarpa. It seems unlikely that FBI's Top Hoodlum
program, its war on the Columbo faction and organized crime strike forces
did not generate separate major case indices.

II.    <u>The District Court Abused Its Discretion in Twice Denying
Clemente's Motions for an Award of Interim Attorney's Fees</u>

A. <u>Standard Governing Interim Award of Attorney Fees</u>

The FOIA provides, that a plaintiff who "substantially prevails" in his
litigation may be awarded reasonable attorney's fees and costs. <u>See</u> 5 U.S.C.

§ 552(a)(4) E). For a court to order an award of fees, it must undertake a two-step inquiry. *Tax Analysts v. U.S. Department of Justice*, 759 F. Supp. 28 (D.D.C. 1991). "First, the court must determine whether the claimant is eligible for attorney's fees." *Electronic Privacy Info. V. U.S. Dept. of Homeland,* 811 F.Supp.2d 216, 231 (D.D.C. 2011), citing *Pyramid Lake Paiute Tribe v. US Dept. of Justice*, 750 F.2d 117, 119 (D.C.Cir. 1984).

Second, the court must determine that the plaintiff is 'entitled' to an award of attorney s fees and costs." Id. at 232, citing *Maryland Dept. of Human Resources v. Sullivan*, 738 F. Supp. 555, 563 (D.D.C. 1990).

B.  The FBI Failed to Contest Either Clemente's Eligibility
    Or Entitlement to Fees; The Only Remaining Issues
    Were (1) Recognition of the Right to Interim Fees
    And (2) The Amount of Fees to Be Paid

By letter dated November 27, 2012, Clemente's counsel, James H. Lesar, wrote the FBI's then counsel, AUSA Tricia Francis, requesting an interim award of attorney's fees. Lesar attached a detailed itemization of his time to his fee application. When Lesar learned that AUSA Francis was being replaced, he re-submitted the attorney fees application by email to AUSA Andrea McBarnette on January 31, 2013.

The parties filed a Joint Status Report on April 25, 2013, which stated

the FBI's belief that an interim fee request was "premature," it being appro-

priate "to resolve the issue of attorney fees at the conclusion of the case."

Therefore, the FBI "will oppose any motion for interim attorney's fees and

intends to seek final resolution of the merits of the case by renewing its

motion for summary judgment." ECF # 85 at 1.  On May 23, 2013, Clemente

moved for an award of interim fees.  ECF # 88.  On August 2, 2013, the FBI

filed its opposition.  ECF # 91.  Clemente filed her reply on August 14,

2013.

## C.  The District Court Abused Its Discretion in Denying Clemente's 1st Interim Attorney's Fees Motion

On August 30, 2013, the District Court denied the motion "without

prejudice."  ECF # 98.  The District Court based its decision on a case it

cited as 716 *Allen v. FBI*, 716 F. Supp. 667, 671 (D.C. Cir. 1989).[4]  Court

first said *Allen* had noted that "if the "government could circumvent the

requirements of the FOIA and avoid full disclosure by a war of attrition. . .

final award of attorney fees would be like the end of a rainbow,

unattainable."  That observation was apt and would prove prognostic in this

case.  But the District Court also represented "the D.C. Circuit [as having]

---

[4] This citation is incorrect.  The correct citation is *Allen v. F.B.I.*, 716 F. Supp. 67 (D.D.C. 1989), but the Court represented it as a decision by the United States Court of Appeals for the District of Columbia Circuit.

"expressly cautioned that courts "should be dissuaded" from granting such requests, and only grant them 'in the unusual instances of protracted litigation and financial hardship.'"   ECF # 98, quoting *Allen*.

Representing this *dicta* in *Allen* as the law of the D.C. Circuit, the District Court proceeded to endorse the further *dicta* in *Allen* which listed, but never applied, a "four factors" test which *Powell v. United States Dep't of Justice*, 569 F. Supp. 1192, 1200 (N.D. Cal. 1983), had "suggested" other courts to apply.  Following the New York District Court's advice, Judge Rothstein then evaluated the "four factors."

The first factor to be considered is "the degree of hardship which delaying a fee award until the litigation is finally concluded would work on plaintiff and his or her counsel. . . ."  The District Court found that Clemente's status as "terminally ill with cancer,"[5] is not relevant to this matter."  ECF # 98 at 5.  She then ruled that because Clemente's counsel had taken the case on a contingency, "Plaintiff's ability to pay is irrelevant."  Id.  Moreover, she agreed with the FBI that Clemente's "counsel has merely established a general financial hardship that faces all attorneys who accept cases on a contingency fee basis. If the Court were to find this a sufficient

---

[5] Clemente was and remains terminally ill, but not with cancer.  The District Court did not mention the fact that she had no funds to pay counsel as a relevant factor.

47

basis on which to grant an award of interim fees, such an award would be

warranted in all FOIA contingency fee cases.  Id.

The District Court did not separately evaluate the remaining three

factors of the "four-factors" test but made it abundantly clear what her

bottom line was.

> Most importantly, this case has reached
> the final stages of litigation. Defendants have
> represented to the Court that they will renew
> their summary judgment motion, a motion that
> has already been fully briefed. The Court is not
> persuaded that defending against Defendants'
> renewed motion will cause Plaintiff to incur
> further expenses of a significant nature. Accord-
> ingly, the Court will refrain from deciding the
> issue of attorney fees at this time.

ECF # 98-5, citing another New York case which *Powell* had relied upon,

See *Biberman v. FBI*, 496 F. Supp. 263, 265 (S.D.N.Y. 1980) for the

proposition that "'a determination of the total amount of fees to be awarded

on one motion at the conclusion of the action would more efficiently decide

the question than periodic interim decisions.'"

Finally, the Court asserted that "[i]f, after resolving the Defendants'

summary judgment motion, it appears that this matter may continue in a

protracted manner, the Court will revisit this issue."

The District Court abused its discretion by committing serious factual

and legal errors.

48

5 U.S.C. § 552(a)(4)(E) provides: "The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." The plain meaning of this provision is that once a complainant has substantially prevailed, the court may award attorney fees.

In his recent opinion in *Hall v. C.I.A.*, C. A. No. 04-0814 (D.D.C. July 15, 2015), the Chief Judge Royce C. Lamberth observed that "[i]nterim fees may be awarded under FOIA." He cited as am example *Nat'l Ass'n of Criminal Defense Lawyers, Inc. v. US. Dep't of Justice*, 182 F.3d 981 (D.C. Cir. 1999); *Washington Post v. U.S. Dep't of Defense*, 789 F. Supp. 423 (D.D.C. 1992). He then noted that "[s]ome FOIA cases dealing with interim fees have erected additional bars to interim fee awards that vary from case to case." But *Hall* pointedly ignored those decisions and did not expressly apply any of the four factors as the basis for his decision to award interim fees, although he did note that the case was protracted.

In applying the "four factors" test enunciated by *Powell* and *Biberman*, the District Court not only erred in apply factors that are irrelevant to a decision to award interim fees, she also made serious errors in applying the factors. In ruling that the fact that Clemente's counsel had taken the case on a contingency was irrelevant to establishing hardship, she

49

ignored the fact that the fact that attorneys in private practice who seek

attorney fees on an interim fee basis almost very frequently do so because

they have taken the cases on a full or partial contingency.

### D. The District Court Abused Its Discretion by Denying Clemente's Renewed Motion for an Interim Award of Attorney's Fees and Costs

After the Court denied her first motion for an interim attorney fees,

Clemente complied with the District Court's order that she select a new

sample *Vaughn* index and undergoing yet another round of summary

judgment motions.  This was a time-consuming, arduous process, but it

resulted in the release of important new information previously withheld

under several different exemption claims.  Having complied with the District

Court's order, Clemente, on July 22, 2015, renewed her motion for an

interim award of fees.  ECF # 126.

This occurred more than two years after she had made her initial

motion for an award of interim fees, and seven years after the case began.

On October 14, 2015, the District Court again denied the motion.  Once

again, the District Court mistakenly relied on *Allen* as D.C. Circuit authority

for denying interim fees.  Once again the Court ruled that Clemente had

failed to establish sufficient financial hardship.  The Court found that

(2) Each agency, in accordance with published rules, shall make available for public inspection and copying—

(A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

(B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;

(C) administrative staff manuals and instructions to staff that affect a member of the public;

(D) copies of all records, regardless of form or format, which have been released to any person under paragraph (3) and which, because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; and

(E) a general index of the records referred to under subparagraph (D);

unless the materials are promptly published and copies offered for sale. For records created on or after November 1, 1996, within one year after such date, each agency shall make such records available, including by computer telecommunications or, if computer telecommunications means have not been established by the agency, by other electronic means. To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, staff manual, instruction, or copies of records referred to in subparagraph (D). However, in each case the justification for the deletion shall be explained fully in writing, and the extent of such deletion shall be indicated on the portion of the record which is made available or published, unless including that indication would harm an interest protected by the exemption in subsection (b) under which the deletion is made. If technically feasible, the extent of the deletion shall be indicated at the place in the record where the deletion was made. Each agency shall also maintain and make available for public inspection and copying current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published. Each agency shall promptly publish, quarterly or more frequently, and distribute (by sale or otherwise) copies of each index or supplements thereto unless it determines by order published in the Federal Register that the publication would be unnecessary and impracticable, in which case the agency shall nonetheless provide copies of an index on request at a cost not to exceed the direct cost of duplication. Each agency shall make the index referred to in subparagraph (E) available by computer telecommunications by December 31, 1999. A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on,

2a

counsel citation of expenses he had incurred in running his office failed to show that this loss "was significantly tied to the instant case." Id. at 6.

Before Clemente filed a second motion for an interim award of fees, her counsel received an award of almost $300,000 in another case. At the time he received that award he did not know whether or not it would be appealed. He also considered it irrelevant to the pending motion because his statement about a net loss of income applied to prior years. More importantly, he considered it irrelevant to Clemente's case. If one enters into a contract with several different companies which each agrees to pay a sum when the ground floor of the building is completed, the payment of funds by the first company to complete the ground floor of his building does not relieve the others of their obligation to pay when the ground floors of their buildings are completed.

The Court's linkage of anticipated receipt of fees in another case and financial hardship in this case based on prior losses is bad economics and worse law.

The Court cast the blame for the protracted nature of the proceedings on Clemente. Clemente, of course, was terminally ill and financially destitute; her counsel was suffering from several serious health problems, including at one point a blood clot in the leg, was 68 years old when he

began this case. And he was working solo and on a contingency basis against a very powerful government agency. The Court acknowledged that the FBI had sought 20 extensions of time, a number of them quite lengthy, and that Clemente had sought 15, generally much shorter. Despite this, the Court stated that "the length of litigation can be largely attributed to Plaintiffs dilatory conduct." Id.

The Court, then asserted "this case must be near its conclusion" and dismissed as "highly unlikely" Clemente's claims that the FBI's "latest *Vaughn* Index raises issues that 'will require considerable additional litigation time and effort.'" Id., citing ECF # No. 126 at 29. The Court then set a November 13, 2015 deadline for Clemente to file objections to the FBI's latest *Vaughn* index. When she failed to do so, Judge Rothstein dismissed the case.

This was unwarranted. When the FBI earlier released a substantial amount of new information as a result of *Vaughn* sample index, the FBI had resisted re-processing the non-sample documents to see if new disclosures should be made in light of those disclosed as a result of the sample. The Court ordered the FBI to re-process all of the non-sample documents. Clemente advised the Court that the next step should be to have the FBI re-process all of the non-sample documents affected by the latest *Vaughn*

disclosures. This would avoid piecemeal and inefficient litigation of the issues raised by the 7th Hardy Declaration without having the benefit of examining any further releases of non-sample documents. The Court's certainty that the case was almost over seems more the product of an idee fixe than a rational assessment of judicial efficiency. The Court could speed up resolution of the case by working on the motion for interim fees while the FBI re-processed the non-sample documents and Clemente selected a new *Vaughn* sample, if warranted, in preparation for a new round of summary judgment motions.

III. The FBI Has Failed to Meet Its Exemption 7 Threshold Burden

    A. The Exemption 7 Threshold

In order to withhold records under Exemption 7, an agency must first show that the records were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7).

> In assessing whether records are compiled for law enforcement purposes, this circuit has long empha-sized that the focus is on how and under what circum-stances the requested files were compiled, see *Weisberg v. United States Dep't of Justice*, 489 F.2d 1195, 1202 (D.C. Cir. 1973), and "whether the files sought relate to anything that can fairly be characterized as an enforce-ment proceeding." *Aspin v. Dep't of Defense*, 491 F.2d 24, 27 (D.C. Cir. 1973).

*Jefferson v. Department of Justice*, 284 F.3d 171, 176, 177 (D.C. Cir. 2002).

   *Jefferson* noted that the D.C. Circuit had previously identified "two types of investigatory files that government agencies compile: (1) files in connection with government oversight of the performance of duties by its employees, and (2) in connection with investigations that focus directly on specific alleged illegal acts which could result in civil or criminal sanctions." Id. at 177, citing *Rural Housing Alliance v. Dep't of Agriculture,* 498 F.2d 73, 81 (D.C. Cir. 1974).

   1. The Evidence Shows the Information in the Informant
      File Was Compiled As Part of a Joint Criminal Enterprise
      Between TE Mafia Informant Scarpa and the FBI; It Was Not
      Compiled for Law Enforcement Purposes

   The District Court rejected as "unpersuasive" Clemente's argument that the Scarpa informant file information was not compiled for law enforcement purposes because Scarpa had engaged in illegal activities at the behest of the FBI. *Clemente I* at 84. The Court noted Hardy's averment that the records in Scarpa's file "'pertain to the investigation of the activities of subject's involvement as a TE informant for the FBI and his involvement in [La Cosa Nostra].'" It found that the contents of the records are consistent with Hardy's declaration. Id.

34

This is a flawed assessment of the applicability of Exemption 7's threshold test in this case. It ignores the illegal uses to which the information and the FBI/DeVecchio/Scarpa relationship were put. The fact that the contents of the documents compiled may be consistent with an "'investigation of the activities of subject's involvement as a TE informant for the FBI and his involvement in [La Cosa Nostra]'" is not inconsistent with the information having also been gathered in a manner that thwarted and violated law enforcement purposes.

The record in this case establishes that "[f]rom approximately 1978 to 1992, Scarpa paid [DeVecchio] for information about the [FBI's] investigation of organized crime. Bordley Affidavit., ¶ 7. In short, the Mafia informant was paying FBI Special Agent DeVecchio bribes for information about the Mafia. But as the contents of the documents which have been released to Clemente show abundantly, the FBI was also paying Scarpa large sums of money for information on the Mafia, even though he was involved in rampant criminal activities which placed him in clear violation of the FBI rule under which a confidential informant "is not permitted to participate in any criminal activities [] in the absence of prior written authorization from F.B.I. supervisors." Bordley Aff., ¶ 9.

DeVecchio and Scarpa clearly used information acquired as a result of their relationship to jointly engage in felonies.  Thus, when Scarpa wanted to murder Lorenzo Lampasi, a member of the rival Orena faction of the Colombo family, he asked DeVecchio to get him information on Lampasi, "including the address where Lampasi was living and the time that Lampasi left his house for work in the morning."  Id., ¶ 34.  DeVecchio obtained the information from "[l]aw enforcement agencies [which] had conducted physical surveillance on Lampasi at his home" and, supplied with this information, Scarpa and his hit team planned and then murdered Lampasi. Id., ¶¶ 35-40.

In view of this and many similar incidents which have been documented above, any claim that the information compiled during Scarpa's tenure as an FBI informant were compiled for law enforcement purposes is not untenable.

## 2. The Scarpa Informant File Did Not Focus Directly on Specific Alleged Illegal Acts Which Could Result in Civil or Criminal Sanctions

The records released to Clemente show that the FBI asked Scarpa to engage in non-specified spying on his associates and report their general conduct, rather than tasking him with reporting or gathering information

56

about specific criminal investigations, apparently in exchange for money and a "get out of jail free" card.

It is clear from DeVecchio's own extreme misconduct in his handling of Scarpa that the records in question should not be considered as having been compiled for law enforcement purposes. Two courts have explicitly addressed the question of whether Supervisory Special Agent DeVecchio was engaged in law enforcement activity in his handling of Scarpa. These cases involved the prosecution of DeVecchio himself for murders he allegedly assisted Scarpa in committing. Both courts emphatically concluded that the actions of DeVecchio, Scarpa's handler, had nothing to do with law enforcement. In response to DeVecchio's efforts to assert a "federal immunity defense" to his indictment on four counts of murder brought against him by the State of New York, one court stated: "A claim of federal immunity is to provide immunity from a state court prosecution for an act committed in the performance of a federal officer's duties." As the District Court Judge in that case noted, "there can be no claim that the four murders alleged were committed in the course of performance of official duties. Deliberately providing confidential police intelligence for the purpose of eliminating possible informants and rivals, revealing law enforcement surveillance and leaking confidential documents <u>are not part of any</u>

57

federal duties." *People v. DeVecchio*, 845 N.Y.S.2d 676, 681, 17 Misc.3d

990, 993 (2007), 2007 N.Y. Slip Op. 27440 (emphasis added).

Thus, at the very least Plaintiff Clemente is entitled to all records

pertaining to the murders of Joseph DeDominico, Lawrence Lampasi, Mari

Bari, and Patrick Porco, including FBI "302" reports generated by

DeVecchio concerning interviews with Scarpa pertaining to the murders, as

well as all reports sent to or from Washington, D.C. pertaining to these

murders.

The position taken by the FBI in responding to a lawsuit brought

under the Federal Torts Claims Act by survivors of a victim who was

murdered by FBI TE informants Bulger and Flemmi in Boston is of some

note. Faced with a lawsuit for money damages, the FBI "argue[d] that,

because federal statutes and regulations do not authorize FBI agents to grant

immunity to informants, any conduct of the FBI agents to shield [them] from

prosecution was outside the scope of the agents' authority and therefore not

actionable under the FTCA." *Estate of Debra Davis v. the United States of*

*America, et al.*, 340 F.Supp.2d 79 (D.Mass. 2004). The implication in the

FOIA context is that records compiled in connection with such *ultra vires*

activities as Scarpa and DeVecchio engaged in are not compiled for law

enforcement purposes.

The early Scarpa records do not fall under this Circuit's definition of "law enforcement" records because they were not acquired in the context of any specific "enforcement proceeding." The records generated during the time DeVecchio was Scarpa's handler clearly were not acquired in the context of a specific "enforcement proceeding," because DeVecchio colluded in criminal activities in furtherance of Scarpa's own personal objectives, which included theft, loan sharking, burglary, murder, and violent assault. Again, the public record confirms evidence that DeVecchio was involved in Scarpa's criminal conduct, aiding and abetting his illegal actions. During a pretrial motions hearing involving his prosecution for assisting Scarpa in committing four murders, the court addressed several alleged prior bad acts of DeVecchio in furtherance of Scarpa's criminal activities, including:

> --Additional homicide evidence;
> --"claims the defendant [Scarpa] engaged in various improper actions to protect [Scarpa] and maintain him as a confidential source . . .;
> --"claims that [DeVecchio] regularly accepted monetary payments and other gifts from [Scarpa] . . .;
> --"evidence asserting [DeVecchio] actively participated in informant's criminal enterprise by providing security in bank burglary committed by members of informant's crew . . .;"
> --"evidence that [DeVecchio] alerted [Scarpa] to surveillance at his club, and provided surveillance tapes and a sealed indictment [to him] . . .;

59

*People v. DeVecchio*, 845 N.Y.S. 676, 2007 N.Y. Slip Op. 27440, 17 Misc.3d 990 (2007).

In attempting to suppress this evidence, DeVecchio's attorney stated that much of it was derived from DeVecchio's own immunized testimony. Id. at 681. While the New York court did not consider violating administrative regulations regarding relations with informants to be entering into a criminal relationship with the informant, it drew a distinction between such violation of administrative regulations and DeVecchio "affirmatively joining forces with Scarpa and providing confidential intelligence" so that Scarpa could murder people. Id. at 682. And that court did conclude that "while such actions are not directly probative of the offenses for which he is charged [four murders], it is relevant circumstantial evidence tending to establish the ongoing criminal relationship and a common plan to commit multiple crimes so related to each other that proof of one tends to establish commission of the other." Id. (Emphasis added.)

3. The Scarpa Informant File Was Compiled in Connection with Oversight of Scarpa and Supervisory Special Agent DeVecchio

As stated in *Jefferson* and *Rural Housing Alliance*, supra, an agency which compiles records in connection with government oversight of the performance of duties by its employees is not compiling them for law enforcement purposes. This aspect of the records compiled regarding Scarpa

60

is clearly revealed in material that has been disclosed pursuant to Clemente's request. A September 13, 1962 teletype from the FBI's NYO advised FBIHQ that Scarpa "has been instructed that under no circumstances can he participate in the murder of Joseph Magliocco." See Exhibit 1, CL (2)-63. A noted from the FBI's Special Investigative Division ("SID") that same day stated that "informant [Scarpa] agrees that he must not participate in the execution of Joseph Magliocco." See Exhibit 2, CL (2)-64. On May 23, 1963, another SID note states that information had been developed in Philadelphia that "a decision had been made by Magliocco and other hoodlum leaders to execute the Gallos." The Gallos were brothers who were part of the Magliocco Group in New York. The note concluded, "New York is handling informant [Scarpa] so that full information will be developed concerning this war without informant being compromised." See Exhibit 3, CL (2)-174.

These documents were not compiled for law enforcement purposes—Scarpa is not instructed to prevent the assassinations or to investigate them for the purpose of prosecuting the killers for the crimes committed; rather he is simply instructed to gather information and avoid getting compromised. Despite the fact that these materials were gathered for administrative pur-

poses involving the supervision of a TE FBI informant, the FBI has made substantial deletions in them.

Further evidence that materials responsive to Clemente's request were compiled for administrative rather than law enforcement purposes is found in the FBI's decision to create new files as a result of the indictment of SSA Roy Lindley DeVecchio. Thus, a July 19, 2006 internal NYO communication requests the creation of several subfiles. See Exhibit 4, CL (2)-1023, Exhibit 5, CL (2)-1357.[6]

Further evidence of the administrative nature of the records sought by Clemente is the critical role played by FBI Assistant Director John P. Mohr. Mohr's name is universally withheld in Scarpa's informant files. The only time it is mentioned is on a FBI form listing the FBI's Assistant Directors and other high echelon FBI officials. It appears for example in CL (2)-810, as the number four man under FBI Director J. Edgar Hoover, after Tolson, Felt, and Rosen. But this list of officers is a stamped list routinely placed on FBI documents, and in this case does not indicate which of the various officers had a particular connection to the Scarpa case.

---

[6] The CL (2)-1357 document comes not from the records released in this case but those released on December 18, 2013 in Clemente's companion case, Civil Action No. 13-0108.

62

While other distribution lists appear on the records indicating the

upper echelon FBI officers who received copies of the records pertaining to

Scarpa, with between one and three names being withheld under Exemption

7C, Mohr's name is always withheld.  However, it is possible to figure out

that Mohr is one of the names withheld because there are instances where

only four or five high officials are listed in the distribution blocks at the

upper right-hand corner or lower left-hand corner of records, and only one of

the names is withheld.  That Mohr's is the name that is being suppressed can

be determined by examining the names of the high officials who do appear

in the distribution lists on records in Scarpa's files and comparing them with

the initials of the officials which appears at the bottom of the page without

being redacted by the FBI.  Exhibit 6, (CL (2)-593) and Exhibit 7 (CL (2)

600), each contain a list of five high FBI officials with only one name being

deleted.  Examination of the initials at the bottom of the page reveals that

one set of initials which does not correspond to the disclosed names is

"JPM" for John P. Mohr.

The Wikipedia entry on Mohr P. Mohr indicates that when he retired

in 1972 he was the FBI's 4th highest official.  His official title was Assistant

to the Director for Administrative Affairs.  A report issued by Attorney

General Griffin Bell in 1978 cited Mohr for having, among other things,

violated Department of Justice regulations prohibiting employees from

giving preferential treatment to employees outside the Department by using

a private company as the exclusive provider of electronic equipment. See

## IV. The District Court Dismissal of this Action Was Unwarranted

The District Court ultimately dismissed because Clemente did not

comply with an order to submit her list of objections to the 7th Hardy

declaration. From Clemente's perspective and that of her counsel, payment

of interim fees, acknowledged as right course of action in the District

Court's initial ruling on interim fees, had become not only a receding

rainbow, but a disappearing rainbow. The only payment to be made, if any,

would come at the end of the case, just as the FBI had insisted all along it

should. Clemente would not be paid the funds necessary to allow her

counsel to continue to represent her in a competent manner.

Dismissal of a civil action is a severe action. It was unwarranted here.

Rather than filing a motion for summary judgment, the FBI simply filed a

new declaration without first engaging in a re-processing of the non-*Vaughn*

sample documents. This was judicially inefficient. The proper procedure,

which the Court had previously followed, was to re-process the non-sample

documents. Then Clemente would be able to dispute the FBI's assertions in

64

a summary judgment motion context without having to engage in piecemeal litigation without the protections provided by the summary judgment process.

The attorney's fees provision is the primary means of enforcing the FOIA. Payment of interim fees makes government agencies pay more attention to the consequences of their actions and enables FOIA lawyers to represent their clients in a way that is not possible when they are handicapped by continued lack of financial resources even though they have substantially prevailed.

The attorney fees provision is the Act's pre-eminent enforcement mechanism. Interim fee awards are an integral part of that scheme. The District Court abused her discretion in undermining the purpose of FOIA in this manner.

## CONCLUSION

For the reasons set forth above this Court should reverse the District Court and remand the case for further proceedings.

James H. Lesar, #114413
930 Wayne Avenue, Unit 1111
Silver Sprinng, MD 20910
Phone:  (301) 328-5920

Counsel for Appellant

Dated:  Aug. 23, 2016

### CERTIFICATE OF SERVICE

I hereby certify that have this 23d day of August, 201, electronically served a copy of the Brief for Appellant on AUSA Daniel P. Schaefer, 555 4th Street, N.W., Washington, D.C. 20530.

James H. Lesar

### CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief for appellant complies with the type and volume limitations set for FRAP 32(a)(7)(B)(i). It contains 12,426 words.

James H. Lesar

# A D D E N D U M  1

Freedom of Inforation Act, 5 U.S.C. § 552, <u>et</u> <u>seq</u>.

# The Freedom of Information Act, 5 U.S.C. § 552,
## As Amended By
## Public Law No. 110-175, 121 Stat. 2524, and
## Public Law No. 111-83, § 564, 123 Stat. 2142, 2184

*Below is the full text of the Freedom of Information Act in a form showing all amendments to the statute made by the "Openness Promotes Effectiveness in our National Government Act of 2007" and the "OPEN FOIA Act of 2009." All newly enacted provisions are in boldface type.*

§ 552. Public information; agency rules, opinions, orders, records, and proceedings

(a) Each agency shall make available to the public information as follows:

    (1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

        (A) descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

        (B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

        (C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

        (D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

        (E) each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

*1a*

used, or cited as precedent by an agency against a party other than an agency only if—

        (i) it has been indexed and either made available or published as provided by this paragraph; or

        (ii) the party has actual and timely notice of the terms thereof.

(3)(A) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

    (B) In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

    (C) In responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system.

    (D) For purposes of this paragraph, the term "search" means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request.

    (E) An agency, or part of an agency, that is an element of the intelligence community (as that term is defined in section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4))) shall not make any record available under this paragraph to—

        (i) any government entity, other than a State, territory, commonwealth, or district of the United States, or any subdivision thereof; or

        (ii) a representative of a government entity described in clause (i).

(4)(A)(i) In order to carry out the provisions of this section, each agency shall promulgate regulations, pursuant to notice and receipt of public comment, specifying the schedule of fees applicable to the processing of requests under this section and establishing procedures and guidelines for determining when such fees should be waived or reduced. Such schedule shall conform to the guidelines

3a

which shall be promulgated, pursuant to notice and receipt of public comment, by the Director of the Office of Management and Budget and which shall provide for a uniform schedule of fees for all agencies.

(ii) Such agency regulations shall provide that—

(I) fees shall be limited to reasonable standard charges for document search, duplication, and review, when records are requested for commercial use;

(II) fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by an educational or noncommercial scientific institution, whose purpose is scholarly or scientific research; or a representative of the news media; and

(III) for any request not described in (I) or (II), fees shall be limited to reasonable standard charges for document search and duplication.

In this clause, the term 'a representative of the news media' means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. In this clause, the term 'news' means information that is about current events or that would be of current interest to the public. Examples of news-media entities are television or radio stations broadcasting to the public at large and publishers of periodicals (but only if such entities qualify as disseminators of 'news') who make their products available for purchase by or subscription by or free distribution to the general public. These examples are not all-inclusive. Moreover, as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunications services), such alternative media shall be considered to be news-media entities. A freelance journalist shall be regarded as working for a news-media entity if the journalist can demonstrate a solid basis for expecting publication through that entity, whether or not the journalist is actually employed by the entity. A publication contract would present a solid basis for such an expectation; the Government may also consider the past publication record of the requester in making such a determination.

4a

(iii) Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

(iv) Fee schedules shall provide for the recovery of only the direct costs of search, duplication, or review. Review costs shall include only the direct costs incurred during the initial examination of a document for the purposes of determining whether the documents must be disclosed under this section and for the purposes of withholding any portions exempt from disclosure under this section. Review costs may not include any costs incurred in resolving issues of law or policy that may be raised in the course of processing a request under this section. No fee may be charged by any agency under this section—

    (I) if the costs of routine collection and processing of the fee are likely to equal or exceed the amount of the fee; or

    (II) for any request described in clause (ii)(II) or (III) of this subparagraph for the first two hours of search time or for the first one hundred pages of duplication.

(v) No agency may require advance payment of any fee unless the requester has previously failed to pay fees in a timely fashion, or the agency has determined that the fee will exceed $250.

(vi) Nothing in this subparagraph shall supersede fees chargeable under a statute specifically providing for setting the level of fees for particular types of records.

(vii) In any action by a requester regarding the waiver of fees under this section, the court shall determine the matter de novo: Provided, That the court's review of the matter shall be limited to the record before the agency.

(viii) An agency shall not assess search fees (or in the case of a requester described under clause (ii)(II), duplication fees) under this subparagraph if the agency fails to comply with any time limit under paragraph (6), if no unusual or exceptional circumstances (as those terms are defined for purposes of paragraphs (6)(B) and (C), respectively) apply to the processing of the request.

5a

(B) On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

(C) Notwithstanding any other provision of law, the defendant shall serve an answer or otherwise plead to any complaint made under this subsection within thirty days after service upon the defendant of the pleading in which such complaint is made, unless the court otherwise directs for good cause is shown.

[(D) Repealed. Pub. L. 98-620, title IV, Sec. 402(2), Nov. 8, 1984, 98 Stat. 3357.]

(E)(i) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.

> (ii) For purposes of this subparagraph, a complainant has substantially prevailed if the complainant has obtained relief through either—

>> (I) a judicial order, or an enforceable written agreement or consent decree; or

>> (II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.

(F)(i) Whenever the court orders the production of any agency records improperly withheld from the complainant and assesses against the United States reasonable attorney fees and other litigation costs, and the court additionally issues a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding, the Special Counsel shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible

6a

for the withholding. The Special Counsel, after investigation and consideration of the evidence submitted, shall submit his findings and recommendations to the administrative authority of the agency concerned and shall send copies of the findings and recommendations to the officer or employee or his representative. The administrative authority shall take the corrective action that the Special Counsel recommends.

        (ii) The Attorney General shall—

                (I) notify the Special Counsel of each civil action described under the first sentence of clause (i); and

                (II) annually submit a report to Congress on the number of such civil actions in the preceding year.

        (iii) The Special Counsel shall annually submit a report to Congress on the actions taken by the Special Counsel under clause (i).

    (G) In the event of noncompliance with the order of the court, the district court may punish for contempt the responsible employee, and in the case of a uniformed service, the responsible member.

(5) Each agency having more than one member shall maintain and make available for public inspection a record of the final votes of each member in every agency proceeding.

(6)(A) Each agency, upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall—

        (i) determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination; and

        (ii) make a determination with respect to any appeal within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such appeal. If on appeal the denial of the request for records is in whole or in part upheld, the agency shall notify the person making such request of the provisions for judicial review of that determination under paragraph (4) of this subsection.

7a

The 20-day period under clause (i) shall commence on the date on which the request is first received by the appropriate component of the agency, but in any event not later than ten days after the request is first received by any component of the agency that is designated in the agency's regulations under this section to receive requests under this section. The 20-day period shall not be tolled by the agency except—

> (I) that the agency may make one request to the requester for information and toll the 20-day period while it is awaiting such information that it has reasonably requested from the requester under this section; or

> (II) if necessary to clarify with the requester issues regarding fee assessment. In either case, the agency's receipt of the requester's response to the agency's request for information or clarification ends the tolling period.

(B)(i) In unusual circumstances as specified in this subparagraph, the time limits prescribed in either clause (i) or clause (ii) of subparagraph (A) may be extended by written notice to the person making such request setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days, except as provided in clause (ii) of this subparagraph.

(ii) With respect to a request for which a written notice under clause (i) extends the time limits prescribed under clause (i) of subparagraph (A), the agency shall notify the person making the request if the request cannot be processed within the time limit specified in that clause and shall provide the person an opportunity to limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request. To aid the requester, each agency shall make available its FOIA Public Liaison, who shall assist in the resolution of any disputes between the requester and the agency. [Effective one year from date of enactment]. Refusal by the person to reasonably modify the request or arrange such an alternative time frame shall be considered as a factor in determining whether exceptional circumstances exist for purposes of subparagraph (C).

8a

(iii) As used in this subparagraph, "unusual circumstances" means, but only to the extent reasonably necessary to the proper processing of the particular requests—

    (I) the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;

    (II) the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or

    (III) the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein.

(iv) Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for the aggregation of certain requests by the same requestor, or by a group of requestors acting in concert, if the agency reasonably believes that such requests actually constitute a single request, which would otherwise satisfy the unusual circumstances specified in this subparagraph, and the requests involve clearly related matters. Multiple requests involving unrelated matters shall not be aggregated.

(C)(i) Any person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph. If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records. Upon any determination by an agency to comply with a request for records, the records shall be made promptly available to such person making such request. Any notification of denial of any request for records under this subsection shall set forth the names and titles or positions of each person responsible for the denial of such request.

    (ii) For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless

the agency demonstrates reasonable progress in reducing its backlog of pending requests.

(iii) Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

(D)(i) Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for multitrack processing of requests for records based on the amount of work or time (or both) involved in processing requests.

(ii) Regulations under this subparagraph may provide a person making a request that does not qualify for the fastest multitrack processing an opportunity to limit the scope of the request in order to qualify for faster processing.

(iii) This subparagraph shall not be considered to affect the requirement under subparagraph (C) to exercise due diligence.

(E)(i) Each agency shall promulgate regulations, pursuant to notice and receipt of public comment, providing for expedited processing of requests for records—

(I) in cases in which the person requesting the records demonstrates a compelling need; and

(II) in other cases determined by the agency.

(ii) Notwithstanding clause (i), regulations under this subparagraph must ensure—

(I) that a determination of whether to provide expedited processing shall be made, and notice of the determination shall be provided to the person making the request, within 10 days after the date of the request; and

(II) expeditious consideration of administrative appeals of such determinations of whether to provide expedited processing.

(iii) An agency shall process as soon as practicable any request for records to which the agency has granted expedited processing

*10a*

under this subparagraph. Agency action to deny or affirm denial of a request for expedited processing pursuant to this subparagraph, and failure by an agency to respond in a timely manner to such a request shall be subject to judicial review under paragraph (4), except that the judicial review shall be based on the record before the agency at the time of the determination.

(iv) A district court of the United States shall not have jurisdiction to review an agency denial of expedited processing of a request for records after the agency has provided a complete response to the request.

(v) For purposes of this subparagraph, the term "compelling need" means—

(I) that a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

(II) with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.

(vi) A demonstration of a compelling need by a person making a request for expedited processing shall be made by a statement certified by such person to be true and correct to the best of such person's knowledge and belief.

(F) In denying a request for records, in whole or in part, an agency shall make a reasonable effort to estimate the volume of any requested matter the provision of which is denied, and shall provide any such estimate to the person making the request, unless providing such estimate would harm an interest protected by the exemption in subsection (b) pursuant to which the denial is made.

(7) Each agency shall—

(A) establish a system to assign an individualized tracking number for each request received that will take longer than ten days to process and provide to each person making a request the tracking number assigned to the request; and

11a

(B) establish a telephone line or Internet service that provides information about the status of a request to the person making the request using the assigned tracking number, including—

    (i) the date on which the agency originally received the request; and

    (ii) an estimated date on which the agency will complete action on the request.

(b) This section does not apply to matters that are—

    (1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;

    (2) related solely to the internal personnel rules and practices of an agency;

    ~~(3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;~~

    (3) specifically exempted from disclosure by statute (other than section 552b of this title), if that statute—

        (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

        (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

        (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

    (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

    (5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

    (6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

12a

(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(9) geological and geophysical information and data, including maps, concerning wells.

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection. The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made. If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.

(c)(1) Whenever a request is made which involves access to records described in subsection (b)(7)(A) and—

(A) the investigation or proceeding involves a possible violation of criminal law; and

(B) there is reason to believe that (i) the subject of the investigation or proceeding is not aware of its pendency, and (ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings, the agency may, during only such time as that circumstance continues, treat the records as not subject to the requirements of this section.

13a

(2) Whenever informant records maintained by a criminal law enforcement agency under an informant's name or personal identifier are requested by a third party according to the informant's name or personal identifier, the agency may treat the records as not subject to the requirements of this section unless the informant's status as an informant has been officially confirmed.

(3) Whenever a request is made which involves access to records maintained by the Federal Bureau of Investigation pertaining to foreign intelligence or counterintelligence, or international terrorism, and the existence of the records is classified information as provided in subsection (b)(1), the Bureau may, as long as the existence of the records remains classified information, treat the records as not subject to the requirements of this section.

(d) This section does not authorize the withholding of information or limit the availability of records to the public, except as specifically stated in this section. This section is not authority to withhold information from Congress.

(e)(1) On or before February 1 of each year, each agency shall submit to the Attorney General of the United States a report which shall cover the preceding fiscal year and which shall include—

(A) the number of determinations made by the agency not to comply with requests for records made to such agency under subsection (a) and the reasons for each such determination;

(B)(i) the number of appeals made by persons under subsection (a)(6), the result of such appeals, and the reason for the action upon each appeal that results in a denial of information; and

(ii) a complete list of all statutes that the agency relies upon to authorize the agency to withhold information under subsection (b)(3), the number of occasions on which each statute was relied upon, a description of whether a court has upheld the decision of the agency to withhold information under each such statute, and a concise description of the scope of any information withheld;

(C) the number of requests for records pending before the agency as of September 30 of the preceding year, and the median and average number of days that such requests had been pending before the agency as of that date;

(D) the number of requests for records received by the agency and the number of requests which the agency processed;

*14a*

(E) the median number of days taken by the agency to process different types of requests, based on the date on which the requests were received by the agency;

(F) the average number of days for the agency to respond to a request beginning on the date on which the request was received by the agency, the median number of days for the agency to respond to such requests, and the range in number of days for the agency to respond to such requests;

(G) based on the number of business days that have elapsed since each request was originally received by the agency—

    (i) the number of requests for records to which the agency has responded with a determination within a period up to and including 20 days, and in 20-day increments up to and including 200 days;

    (ii) the number of requests for records to which the agency has responded with a determination within a period greater than 200 days and less than 301 days;

    (iii) the number of requests for records to which the agency has responded with a determination within a period greater than 300 days and less than 401 days; and

    (iv) the number of requests for records to which the agency has responded with a determination within a period greater than 400 days;

(H) the average number of days for the agency to provide the granted information beginning on the date on which the request was originally filed, the median number of days for the agency to provide the granted information, and the range in number of days for the agency to provide the granted information;

(I) the median and average number of days for the agency to respond to administrative appeals based on the date on which the appeals originally were received by the agency, the highest number of business days taken by the agency to respond to an administrative appeal, and the lowest number of business days taken by the agency to respond to an administrative appeal;

(J) data on the 10 active requests with the earliest filing dates pending at each agency, including the amount of time that has elapsed since each request was originally received by the agency;

15a

(K) data on the 10 active administrative appeals with the earliest filing dates pending before the agency as of September 30 of the preceding year, including the number of business days that have elapsed since the requests were originally received by the agency;

(L) the number of expedited review requests that are granted and denied, the average and median number of days for adjudicating expedited review requests, and the number adjudicated within the required 10 days;

(M) the number of fee waiver requests that are granted and denied, and the average and median number of days for adjudicating fee waiver determinations;

(F) (N) the total amount of fees collected by the agency for processing requests; and

(G) (O) the number of full-time staff of the agency devoted to processing requests for records under this section, and the total amount expended by the agency for processing such requests.

(2) Information in each report submitted under paragraph (1) shall be expressed in terms of each principal component of the agency and for the agency overall.

(2) (3) Each agency shall make each such report available to the public including by computer telecommunications, or if computer telecommunications means have not been established by the agency, by other electronic means. In addition, each agency shall make the raw statistical data used in its reports available electronically to the public upon request.

(3) (4) The Attorney General of the United States shall make each report which has been made available by electronic means available at a single electronic access point. The Attorney General of the United States shall notify the Chairman and ranking minority member of the Committee on Government Reform and Oversight of the House of Representatives and the Chairman and ranking minority member of the Committees on Governmental Affairs and the Judiciary of the Senate, no later than April 1 of the year in which each such report is issued, that such reports are available by electronic means.

(4) (5) The Attorney General of the United States, in consultation with the Director of the Office of Management and Budget, shall develop reporting and performance guidelines in connection with reports required by this subsection by October 1, 1997, and may establish additional requirements for such reports as the Attorney General determines may be useful.

*16a*

(5) (6) The Attorney General of the United States shall submit an annual report on or before April 1 of each calendar year which shall include for the prior calendar year a listing of the number of cases arising under this section, the exemption involved in each case, the disposition of such case, and the cost, fees, and penalties assessed under subparagraphs (E), (F), and (G) of subsection (a)(4). Such report shall also include a description of the efforts undertaken by the Department of Justice to encourage agency compliance with this section.

(f) For purposes of this section, the term—

(1) "agency" as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency; and

(2) "record and any other term used in this section in reference to information includes any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format.

(2) 'record' and any other term used in this section in reference to information includes—

(A) any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format; and

(B) any information described under subparagraph (A) that is maintained for an agency by an entity under Government contract, for the purposes of records management.

(g) The head of each agency shall prepare and make publicly available upon request, reference material or a guide for requesting records or information from the agency, subject to the exemptions in subsection (b), including—

(1) an index of all major information systems of the agency;

(2) a description of major information and record locator systems maintained by the agency; and

(3) a handbook for obtaining various types and categories of public information from the agency pursuant to chapter 35 of title 44, and under this section.

(h)(1) There is established the Office of Government Information Services within the National Archives and Records Administration.

17a

(2) The Office of Government Information Services shall—

    (A) review policies and procedures of administrative agencies under this section;

    (B) review compliance with this section by administrative agencies; and

    (C) recommend policy changes to Congress and the President to improve the administration of this section.

(3) The Office of Government Information Services shall offer mediation services to resolve disputes between persons making requests under this section and administrative agencies as a non-exclusive alternative to litigation and, at the discretion of the Office, may issue advisory opinions if mediation has not resolved the dispute.

(l) The Government Accountability Office shall conduct audits of administrative agencies on the implementation of this section and issue reports detailing the results of such audits.

(j) Each agency shall designate a Chief FOIA Officer who shall be a senior official of such agency (at the Assistant Secretary or equivalent level).

(k) The Chief FOIA Officer of each agency shall, subject to the authority of the head of the agency—

    (1) have agency-wide responsibility for efficient and appropriate compliance with this section;

    (2) monitor implementation of this section throughout the agency and keep the head of the agency, the chief legal officer of the agency, and the Attorney General appropriately informed of the agency's performance in implementing this section;

    (3) recommend to the head of the agency such adjustments to agency practices, policies, personnel, and funding as may be necessary to improve its implementation of this section;

    (4) review and report to the Attorney General, through the head of the agency, at such times and in such formats as the Attorney General may direct, on the agency's performance in implementing this section;

    (5) facilitate public understanding of the purposes of the statutory exemptions of this section by including concise descriptions of the exemptions in both the agency's handbook issued under subsection (g), and the agency's

18a

annual report on this section, and by providing an overview, where appropriate, of certain general categories of agency records to which those exemptions apply; and

(6) designate one or more FOIA Public Liaisons.

(l) FOIA Public Liaisons shall report to the agency Chief FOIA Officer and shall serve as supervisory officials to whom a requester under this section can raise concerns about the service the requester has received from the FOIA Requester Center, following an initial response from the FOIA Requester Center Staff. FOIA Public Liaisons shall be responsible for assisting in reducing delays, increasing transparency and understanding of the status of requests, and assisting in the resolution of disputes.

19a